49 N.J. Super. 187 (1958)
139 A.2d 436
JOHN BUCUK, PETITIONER-APPELLANT,
v.
EDWARD A. ZUSI BRASS FOUNDRY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1957.
Decided March 4, 1958.
*190 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Mortimer Wald argued the cause for petitioner-appellant.
Mr. Edward B. Meredith argued the cause for respondent-respondent.
*191 The opinion of the court was delivered by CONFORD, J.A.D.
Petitioner was awarded compensation for an occupational disease by the Division of Workmen's Compensation. On appeal, the Essex County Court reversed on the sole ground that petitioner had failed to give notice to the respondent of the contraction of the disease "within ninety days after the employee knew or ought to have known the nature of his disability and its relation to his employment," as required by N.J.S.A. 34:15-33. Respondent defends the result not only on the ground of decision relied on by the County Court but also on the contentions that the claim was barred by limitations and substantively not attributable in entirety to the particular employer charged therefor in the Division.
Petitioner is 61 years of age. He is concededly suffering from silicosis caused by exposure to dust in his employment as a molder. That has been his occupation almost continuously from 1918 until August 4, 1954. A proper understanding of this case requires setting forth the respective periods of petitioner's employments in this occupation.

 1918-1923  A.P. Smith Company
 1923-1942  Jenkins Foundry (During this period he returned
 to A.P. Smith Company for about
 three months.)
 8-17-42 to
 2-28-52  Phoenix Brass Fittings Co.
 3-13-52 to
 6-15-53  Edward A. Zusi Brass Foundry
 (respondent herein)
 6-25-53 to
 7-6-53  Krouse-Doremus Foundry
 10-5-53 to
 8-4-54  A.P. Smith Company

On August 4, 1954 petitioner was disabled at work by an accidental injury to his back. On October 4, 1954 he retained his present counsel, a conceded specialist in workmen's *192 compensation law, to represent him in that connection, and the latter concluded from his employment and medical history and symptoms that he had silicosis. Petitioner had previously been informed that he had a disease having that name. The attorney informed petitioner what the disease was and that it was compensable and advised him to file a claim against A.P. Smith Company "on the theory," in the language of counsel's explanation to the Deputy Director, "that the last employer is responsible for the disability for an occupational disease." Accordingly, on October 11, 1954, petitioner filed a claim petition in the Division against the A.P. Smith concern. Hearings were held thereon July 21, 1955 and September 21, 1955. On the latter day the Deputy Director delivered an oral opinion dismissing the claim on the ground that petitioner had not sustained his burden of establishing that any part of the existing silicosis disability was attributable to his employment with that company. There was an express finding that petitioner was not actually exposed to silica or other foreign bodies during that employment. No appeal was taken from this determination.
There apparently had been medical testimony on the first hearing day to the effect that x-rays taken near the commencement and termination of the employment period with A.P. Smith Company disclosed a constant silicosis condition during that period. Petitioner's counsel represents to the Court that since this testimony, together with information indicating that the respondent in that proceeding would establish that petitioner was not exposed to silica dust while in its employ, satisfied him that the petition would be dismissed, he decided to advise petitioner to file at once separate claim petitions for the occupational disease against these other employers implicated in the occupational history, Phoenix Brass Fittings Co., Edward A. Zusi Brass Foundry (present respondent), and Krouse-Doremus Foundry. Such petitions were filed August 6, 1955 and served September 8, 1955. It is conceded that no prior notice of this claim was ever served on the present respondent and that it never had *193 actual knowledge during petitioner's period of employment with it (March 13, 1952 to June 15, 1953) that he had contracted silicosis. The same insurance company, however, covered all of the employers herein mentioned for workmen's compensation and has defended against each of the claims.
Medical testimony by Dr. Saul Lieb on behalf of petitioner in the present proceeding was to the effect that an examination on December 22, 1954 indicated "advanced second stage silicosis with emphysema," the consequent disability being estimated by the witness at 50% of total. A re-examination by the same physician July 2, 1956 showed the same general condition, but with increased disability, estimated at two-thirds of total. The witness gave it as his opinion "that the silicosis and emphysema in this case represents the sum total of all the exposures in [petitioner's] work as a molder and [in?] various foundries over a period of years." The Deputy Director dismissed the petitions against the employers other than Edward A. Zusi Brass Foundry on the ground that, while "the silicosis appears to have been in progress over a period of many years," the disability "became fixed" during the Zusi period of employment rather than the others. An award of 40% of partial permanent was entered against respondent. The Deputy Director held the claim not barred by the Statute of Limitations "and that the respondent had notice and knowledge of the injury under the provisions of the Compensation Act." There was no elaboration or specification of this finding.
On the appeal by the respondent, the County Court found it necessary to consider only the question as to whether the claim was barred by either the limitations or notice of claim provisions of the statute respecting compensation for occupational diseases. The former, N.J.S.A. 34:15-34, so far as here material, requires the filing of a claim "within two years after the date on which the employee ceased to be exposed in the course of employment with the employer to such occupational disease * * * or within one year after the employee knew or ought to have known the nature of his disability and its relation to his employment, whichever period is later in duration."
*194 The notice of claim provision is to be found in N.J.S.A. 34:15-33, which reads as follows:
"Unless the employer during the continuance of the employment shall have actual knowledge that the employee has contracted a compensable occupational disease, or unless the employee or someone on his behalf or some of his dependents, or someone on their behalf, shall give the employer written notice or claim that the employee has contracted a compensable occupational disease, which notice to be effective must be given within a period of five months after the date when the employee shall have ceased to be subject to exposure to the occupational disease, or within ninety days after the employee knew or ought to have known the nature of his disability and its relation to his employment, whichever period is later in duration, no compensation shall be payable on account of the death or disability by occupational disease of the employee."
It has already been noted that there is no contention or showing that respondent had "actual knowledge" of petitioner's disease while he was employed there. Nor is it contended that respondent had such imputed knowledge as would excuse the failure to give notice. Cf. Panchak v. Simmons Co., 15 N.J. 13 (1954). Respondent had no notice or knowledge of this claim until it was served with the claim petition September 8, 1955. This was more than five months after cessation of petitioner's exposure to the dust at the Zusi foundry, and, consequently, the claim is barred under the notice of claim provision if it is properly to be found that petitioner "knew or ought to have known the nature of his disability and its relation to his employment" on or prior to June 10, 1955 (90 days prior to September 8, 1955). And, under the limitations provision, the claim is barred if petitioner "knew or ought to have known the nature of his disability and its relation to his employment" on or prior to August 6, 1954 (one year prior to the date of filing the petition). The County Court found that petitioner did not have the degree of knowledge specified by the statute prior to the time when he consulted his attorney in reference to filing his first claim for occupational disease, against A.P. Smith Company, in October 1954 but that he did gain such knowledge at that time. It *195 consequently held that, while the claim was not barred by lateness in filing the petition, it was for lateness in notifying respondent of the claim.
On the present appeal respondent justifies the result below not only on the ground relied upon by the court but also on the basis of the limitations provision. Additionally, it submits the contention that petitioner's condition cannot impute liability to respondent; that the evidence requires the conclusion either that petitioner's disability "largely antedated" his employment with respondent or else that it did not flower into "actual incapacity" until after the employments either with Krouse-Doremus or A.P. Smith, either hypothesis assertedly negativing liability insofar as Zusi is concerned.
The following excerpts from the County Court's careful and objective recital of the facts concerning petitioner's ailment will have relevance in respect to the matters of timeliness of notice and limitations, as well as to respondent's substantive responsibility if the other defenses are rejected.
"John Bucuk was born in Poland. His formal education there consisted of six or eight months of schooling. He migrated to the United States in 1912. His first recourse to a physician occurred in December 1952, when `I catch some cold and from that time I just start to cough and cough and cough.' He also had a fever. It will be noted that he was then employed by respondent. He went to Dr. Kimmel and after five weeks he felt better and returned to work. There was no further treatment. He testified that he had no idea at the time of the cause of his trouble. As previously related, he remained in the employ of Zusi until June 15, 1953, at which time he was involved in a layoff.
On June 25, 1953 he went to work for Krouse-Doremus. After a few days there he began to feel sick and he stopped work on July 6. He consulted Dr. Macarcheck who ultimately had him admitted to Mountainside Hospital. Apparently the doctor treated him for a little more than four months. The petitioner averred that he did not know what was wrong with him at that time; he was coughing and had a fever, and he identified the condition as being the same as he had had previously. He did not ask the doctor what was wrong, nor did the physician define his trouble, save to tell him that `it is a fever, to do this and that, and you will get better.' While he did not know what was wrong with him, he entertained some notions from time to time that it was somehow connected with his work. For instance, it appears in the testimony *196 given by him in the A.P. Smith case that when he consulted Dr. Macarcheck he said that he worked in a foundry and that `a lot of that dust and heat has gotten me.' He admitted in his current testimony that he had `probably' so testified though he had previously hedged by testifying in this wise:
`Q. When Dr. Macarchek treated you in 1954 you told him that you worked in a foundry and that you thought your condition was due to the dust and the heat in the foundry, didn't you? A. I don't tell him anything. I ask him what is wrong with me. He says, I have fever and probably from cold or something like that, but 
`Did you tell him you worked in a foundry? A. Yes, I told him.
`Q. Did you tell him that you worked in a dusty atmosphere?
A. I didn't tell him about dusty. I told him I worked in a foundry.'
He admitted that when he was in Mountainside Hospital he thought that his condition was probably due to his work, though he had not discussed the situation with anyone other than his wife, `but she don't know much about cases.' When he was asked what was the basis of his thought, he replied, `Well, I just think it may be from work.' When further questioned, he revealed his thinking in these words, `Because how can I get that sick if I don't work. It must be from work.'
* * * Two voids feature the proofs on these two illnesses of the petitioner: the diagnoses of Drs. Kimmel and Macarchek were not supplied, nor was their testimony on the subject of whether either or both of the physicians had counseled him against returning to employment in his usual trade. In each instance he returned to molding. * * *
* * * [A]n X-ray of petitioner's chest [was made] about six or seven weeks after commencing this employment [with A.P. Smith]. The X-ray study was part of a `pre-employment' examination. The results of that study were not made known to the employee until April 1954, following his return after a five-weeks absence caused by a `cold.' Communication of this information was made by his foreman who told him that there was something wrong with his chest, that he had `silicosis,' and that he should not work there. According to petitioner, disclosure stopped there. What `silicosis' was he did not know. He did not tell me `anything about dusty,' was petitioner's reply to his cross-examinant when asked whether he did not know at that time that it was because of dusty conditions and the kind of work. Knowledge of the meaning of `silicosis' did not come into his possession, he said, until he consulted his lawyer in October 1954, following a back injury on August 4 of that year. There was no testimony offered by respondent covering the interview between petitioner and his foreman, nor was there any explanation offered to account for the failure to produce Mr. Oeser, the foreman, to counter the claimant's version. * * * [Petitioner] admitted in the course of * * * testimony [in the A.P. Smith case] that Oeser had told him that he had `silicosis' and that he would be better off working on the outside, Oeser explaining that he would `feel better *197 if (he worked) outside.' And there is other testimony dealing with the communication to him by Oeser of the danger of working at A.P. Smith, e.g.:
`Q. And when Mr. Oeser suggested that you do outside work you and he both knew it was because working for A.P. Smith Company was dangerous to your chest condition, is that right? A. I guess so.
`Q. Did you know that at the time you talked to him? A. I don't know at that time when I talked to him.
`Q. As a matter of fact, Mr. Bucuk, you told Mr. Oeser that because you knew that it was not advisable for you to go to work in A.P. Smith, was it? A. Yes, Mr. Oeser told me that, but at that time I haven't got no other work, and the work don't bother me much, I just working.
`The Deputy Director: When Mr. Oeser told you it would be better to get outside work, Mr. Bucuk, he told you  you knew that he didn't think it was good for you 
`The witness: Yes.
`The Deputy Director:  to continue to work, is that right?
`The Witness: That's right.'"
It was the view of the County Court from the testimony thus summarized that through the period of petitioner's hospitalization in the summer of 1953 (before he began to work for A.P. Smith) and until April 1954 he did not know nor ought to have known that his condition was related to his work; moreover, that he did not then know, nor ought to have known, the nature of his disability. The emphasis, however, was on the latter conclusion. It was thought that petitioner's symptoms might be indicative of many kinds of maladies and that even some physicians might be puzzled by them or unaware of their true significance. More difficulty was encountered by the court, however, in dealing with the significance of the information imparted to petitioner by his foreman at the A.P. Smith plant, in April 1954, to the effect that he had "silicosis" and that he should not work there. It is implicit in the opinion of the County Court that it considered that the interview referred to did apprise petitioner that his condition had something to do with his occupational activity. But the additional statutory prerequisite for the running of the periods of notice and limitations, of knowledge (actual or imputable) "of the nature of his disability" as of that time *198 was held not to exist. The court emphasized that petitioner was never, prior to October 1954, told what "silicosis" meant. The court said:
"* * * [C]lose perusal of the testimony does not detract from the petitioner's insistence that though `silicosis' was the term used, there was no explanation of what it meant, and a showing that there was any exploration conducted as to the origin of his plight in terms of exposures in previous employments is absent. For all that this testimony evinces, the petitioner was merely informed that he had a chest condition and that it was not wise for him to continue in that employment. The nature of his condition and its origin in relation to time and place were not the subjects of discussion. Yet, those are the components of knowledge that one searches for in determining the quantity and quality of a petitioner's awareness of the nature of his disability and its relation to his occupation.
Though true that medical nomenclature may be a factor of significant importance when the person to whom it is transmitted is admittedly or inferentially informed on such matters, and therefore appreciative of its connotations in terms of disability, it is likewise true that little, if any, importance can be attributed to it when the petitioner is an uninformed laborer, as the present record indicates him to be. The language difficulties that mark his testimony do not comport with the idea that a finely tooled word like `silicosis' would carry into his mind the concept of the nature of his disability. * * *"
As already noted, the consequent conclusion of the court was that not both of the two necessary aspects of the critical knowledge existed in April 1954. It was held, however (by plain implication), that such knowledge did arise as a result of petitioner's conference with his attorney in October 1954. This conclusion was apparently based exclusively upon implicit determinations that thereupon petitioner not only knew he had silicosis, but also what its nature was and that it was causally related to his employment as a molder.
From what has gone before, it is apparent that the County Court entertained a conception of the statutory determinant  the time when the employee "knew or ought to have known the nature of his disability and its relation to his employment"  which was out of the context of the substantive problems as to which of successive employers are liable for an occupational disability when there has been actual *199 or apparent exposure in several different places, and as to when petitioner's particular condition may be said to have matured to the point of legal condensability as against the present respondent. We are satisfied that a fair and practicable application of the statutory provisions in the present case requires an approach based upon the broader perspective mentioned.

I.
The purpose of statutory provisions for notice to employers of compensable accidents or conditions is dual: first, to enable the employer to provide immediate medical diagnosis and treatment for the purpose of minimizing the harm; second, to facilitate the earliest possible investigation of the facts. 2 Larson, Workmen's Compensation Law (1952), § 78.20, p. 253; Hercules Powder Co. v. Nieratko, 113 N.J.L. 195 (Sup. Ct. 1934), affirmed 114 N.J.L. 254 (E. & A. 1935). Where applicable, compliance with such a provision is mandatory. Ibid.; Panchak v. Simmons Co., supra (15 N.J. at page 16). On the other hand, the construction of such a provision from the standpoint of the employee must be attuned to the practicalities. The most authoritative recent characterization of the legislative purpose in adding the language, "within ninety days after the employee knew or ought to have known the nature of his disability and its relation to his employment" (L. 1948, c. 468) to the statutory specification of the period for giving notice of claim in cases of occupational disease is that set forth by Mr. Justice Jacobs in the Panchak case, supra, as follows (15 N.J. at page 25):
"* * * the inherently just approach which precludes the barring of a compensation claim for lack of notice before the workmen knew or had reason to know that he had a claim" (emphasis supplied).
Throughout the same opinion there are recurrent soundings of the theme that the notice or claim periods should not be held to begin to run until "the employee knows or *200 ought to know that he has a compensable injury" (Ibid., 15 N.J. at page 21; emphasis supplied). (All references hereinafter to "knowledge" are to be understood as including the imputable knowledge reflected by the statutory "or ought to have known.")
The application of this approach to the specific problem before us requires a probing of the legislative intention in respects which have no clear surface manifestation in the legislative language but are not therefore less central to the fundamental underlying purposes and objects of the provisions to be interpreted. The statute calls for the giving of notice of claim to the "employer" and to the filing of a claim in terms of reference to "the employer" with whom there was employment exposure to the occupational disease. Therefore a first interpretive principle must be that the statutory references to the employee's knowledge "of the nature of his disability and its relation to his employment" are to be taken in the first instance as meaning the relation of the disability to his employment with the employer sought to be held accountable in the particular proceeding, rather than to his habitual occupation, per se. Additionally, however, since our concern is with the employee's knowledge that he has a compensable condition, the statute must be interpreted to give relevance to the employee's knowledge or state of mind concerning every fact which, as a matter of law, whether in statute or decided case, bears upon the legal responsibility to the employee of the particular employer being proceeded against. As will be seen later in this opinion, the relationship of the disease to employment with employers other than the respondent employer may become relevant in respect to the legal responsibility of the latter in a particular case. We may therefore sum up the controlling principle of construction by saying that the respondent can claim no more in respect of these statutory provisions than that the petitioner should have given it notice and filed his claim against it within the respective statutory periods after the point in time when he had knowledge of such facts as operated, as of that time, and as a matter of *201 what then appeared to be the law, to fasten disability for compensation to the petitioner upon said respondent. If the disability as to which petitioner may be found to have had factual knowledge as of any particular point of time did not, in law, and under all relevant circumstances then known to petitioner, fasten liability in compensation upon this respondent, time could not begin to run against the petitioner.
Nothing in the literal statutory expressions is at war with the foregoing analysis. The legislative draftsman was obviously thinking only of the case of an occupational disease incurred during employment with a single employer and therefore did not articulate the qualifications of the language which we have found above are clearly to be implied in situations of exposure to occupational disease in multiple employment.
An application of the foregoing statutory interpretation to the case at hand requires, initially, the making of mixed fact-law determinations as of each critical stage of development both of the disease itself and of petitioner's knowledge concerning the disease and its origin. These stages may be significantly classified, for present purposes, as follows: (1) the period of employment with Zusi, terminating with his layoff June 15, 1953; (2) thereafter and until petitioner started work with A.P. Smith on October 5, 1953; (3) thereafter and until he was told by the foreman at A.P. Smith that he had silicosis, in April 1954; (4) thereafter and until he consulted with his attorney in October 1954; (5) thereafter and until the partial hearing of the case against A.P. Smith in July 1955.

II.
The making of the necessary mixed fact-law determinations is easier projected than accomplished. The most serious impediment is the difficulty of enunciating the status of the substantive law of workmen's compensation as applied to the question of respondent's liability to petitioner in any of the chronological stages posed above. Such questions as *202 these call for postulates: (a) was there a compensable disability prior to employment with Zusi; (b) was there a compensable disability as against Zusi when the petitioner was home ill for five weeks beginning in December 1952, assuming that illness was a symptom of the silicosis; (c) was there such a disability at the time Zusi laid petitioner off in June 1953; (d) if either question (b) or (c) is answered in the affirmative, was there a retroactive elimination of Zusi's liability because of the continuation of exposure at Krouse-Doremus, and substitutionary succession of liability by that company; (e) would there have been substitutionary succession of liability by A.P. Smith and elimination of liability of prior employers, including Zusi, assuming injurious exposure at A.P. Smith. In connection with the last inquiry, it must be considered that petitioner had every justification in assuming that he experienced the same kind of exposure to occupational disease at A.P. Smith as at previous foundries, the apparent conditions of exposure being the same, and actual knowledge of the fact that there had been no new injury or appreciable exposure to silica dust at A.P. Smith accruing to petitioner for the first time when that company adduced its proofs in the hearing of the claim against it in 1955.
Continuously from the time of the rendition of the decision in Textileather Corp. v. Great American Indemnity Co., 108 N.J.L. 121 (E. & A. 1931), and at least until the deliverance in Calabria v. Liberty Mutual Ins. Co., 4 N.J. 64 (1950), there was justified reliance by workmen's compensation practitioners upon the view that a compensable disability on account of an occupational disease did not arise, notwithstanding the extent of the internal ravages of the disease, until "the employee is incapacitated for work" (108 N.J.L., at page 124). In Textileather, as well as in others of a series of cases following it, the courts fastened full liability for permanent disability upon that insurer which was on a risk at the time the employee ceased work, absolving any prior insurers regardless of the extremity of progression of the disease, short of cessation of work, during *203 their coverage, and without apparent concern for the shortness of the period of coverage by the last insurer. Natural Products, etc. Co. v. Hudson Common Pleas, 123 N.J.L. 522 (Sup. Ct. 1940), affirmed, but without passing on this question, in 125 N.J.L. 309 (E. & A. 1940); Belanowitz v. Travelers Insurance Co., 123 N.J.L. 574 (Sup. Ct. 1940), affirmed on other grounds in 125 N.J.L. 301 (E. & A. 1940), the Supreme Court's holding being there (125 N.J.L. at page 306) paraphrased to the effect that "there can be no compensation for a functional disability which does not result in inability to work, because the time fixed for the commencement of the award is when the disease results in incapacity or death"; Yurow v. Jersey Hat Corp., 131 N.J.L. 265 (Sup. Ct. 1944).
In the Natural Products case, supra, an adequate degree of "inability to work" was held manifested when the employee on doctor's directions changed his work to a kind not involving the deleterious exposure.
There is no tenable distinction of the cited cases on the basis that they involved contests between successive insurers of a single employer, rather than determinations in cases of successive employers of the diseased employee, the court in Textileather premising its determination as between the contesting insurers on the assumption that "the employer's liability was fixed" as of the time when disability occurred, in the sense already indicated (108 N.J.L. at page 125).
The ratio decidendi of the Textileather doctrine was not that there is anything about an occupational disease, as such, which should relieve an employer from the liability which ordinarily attaches in workmen's compensation where there is a work-connected "loss of physical function which detracts from the former efficiency of the body or its members in the ordinary pursuits of life," regardless of diminution or impairment of earning power, as expressed in such cases as Burbage v. Lee, 87 N.J.L. 36 (Sup. Ct. 1915), and De Zeng Standard Co. v. Pressey, 86 N.J.L. 469 (Sup. Ct. 1914), affirmed 88 N.J.L. 382 (E. & A. 1915). Rather it was that because the development of occupational diseases *204 is characteristically gradual, but variable in different diseases and with different persons, the earlier stages being frequently undetectable, the only rule which would assure the benevolent legislative objective of recovery in every meritorious case was one which would fix liability at the single and easily determinable point when there was inability to work or death (108 N.J.L., at pages 123, 124).
It was inevitable, however, that sooner or later occupational diseases would eventuate in kinds of disabilities where the manifestation of physical impairment was so tangible that the rationale of the Textileather doctrine would be inapplicable and the logic of recovery by analogy with traumatic injury in ordinary accident compensation law so impelling as to lead to allowance of compensation notwithstanding continuing ability to work and earn. Sutkowski v. Mutual Chemical Co., 115 N.J.L. 53 (Sup. Ct. 1935), was such a case, allowing partial permanent compensation for a perforated septum (nasal membrane) due to chrome poisoning, with no interruption of work or earnings. The court did not cite or distinguish the Textileather case. It flatly applied the rule of Burbage v. Lee, supra, declaring: "This is a compensable disability, even though Sutkowski's capacity to render the service at which he was engaged was not thereby impaired or his earning power diminished." (115 N.J.L. at page 55). The first reference to the Textileather case in a decision allowing recovery for a disability from an occupational disease not involving impairment or cessation of work came in Koval v. Natural Products Refining Co., 25 N.J. Misc. 489 (Sup. Ct. 1947). This was also a perferated septum case, wherein it was held that the compensable injury did not mature until the perforation reached its full size. The treatment of Textileather in Koval is enigmatic. The court stated (25 N.J. Misc. at page 491): "Disability arises rather when incapacity occurs (citing Textileather.) But incapacity, in the strict fullness of that word, may not occur, perhaps did not occur in this case, and need not occur" (citing Sutkowski v. Mutual Chemical Co., supra).
*205 Another case of septum perforation due to occupational chrome poisoning was presented in Calabria v. Liberty Mutual Insurance Co., supra. The court reiterated the rule of Textileather to the effect that "[d]isability arises when incapacity occurs" (4 N.J. at page 70), but apparently intended to confine the application of that rule to a fact situation resembling the kind of gradually progressive occupational disease involved in Textileather, as it allowed recovery on the authority of the Sutkowski and Koval cases, supra, reiterating the principle, in application to injuries of that kind, that "incapacity * * * need not occur to create partial permanent disability arising from occupational poisoning" (4 N.J. at page 70). The court went on to verbalize the criterion for "the status of compensable disability from such an occupational disease as chrome poisoning" as being when "a definite fault akin to a traumatic injury occurs" (4 N.J. at page 71). For another instance of a condition arising out of an occupational disease held compensable although not involving impairment of earning power or capacity to work, see Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (App. Div. 1952) ("effemination" and impotency through handling a chemical containing female sex hormones). Cf. Duncan v. T.I. McCormack Trucking Co., 43 N.J. Super. 352 (App. Div. 1956) ("Dupuytrens Contracture," producing a claw-like condition of the hands); McBride v. Royal Laundry Service Inc., 44 N.J. Super. 114, 116 (App. Div. 1957) (impairment of hearing because of occupational exposure to noise).
The formula, "a definite fault akin to a traumatic injury," stated in Calabria, has since that decision been commonly adverted to by the courts as relevant even in cases involving internal progressive occupational disease, although no decided case has had occasion to apply it in such a situation to hold for compensability where the employee continued to work. See Estelle v. Board of Education of Borough of Red Bank, 26 N.J. Super. 9, 23, 24 (App. Div. 1953) (where the rule of Textileather was deemed "slightly modified" by Calabria), modified 14 N.J. 256 (1954) (without *206 consideration of the point); McBride v. Royal Laundry Service, Inc., supra; Biglioli v. Durotest Corp., 44 N.J. Super. 93, 97 (App. Div. 1957), affirmed 26 N.J. 33 (1958). In the case last cited the question for decision was whether a common law action by an employee could be maintained against her employer for beryllium poisoning, the exposure having ceased and the illness begun prior to January 1, 1950, the date when that disease became compensable under the workmen's compensation act for the first time (by amendment, L. 1949, c. 29), but knowledge of the disease and cessation from work having occurred subsequent to that date. For reasons not here material, the common law remedy was held barred, but the court eschewed a determination as to whether the disease could be compensable under the amendment on the hypothesis that the disability did not arise until after January 1, 1950. The Supreme Court does, however, refer to both the Textileather and Calabria lines of authority as seemingly still applicable and affords a clue to their proper differentiation when it declares, in reference to the condition of the plaintiff before it, as of prior to the date of cessation of employment: "This is not a case of a known partial permanent injury as, e.g. in Sutkowski [perforated septum] * * * but the consequence of a progressive occupational disease from successive exposures to a poisonous element that becomes compensable when it becomes disabling" (26 N.J., at page 42).
The distinction thus adumbrated may possibly be articulated with rough accuracy as follows. When the disease is of a nature which is gradually progressive and does not manifest the kind of tangible bodily injury or impairment which is specifically demonstrable, and cognizable even by a layman, but takes its toll in a general over-all condition of malaise eventually forcing discontinuance of work at the injurious occupation, the inception of compensable status is when such discontinuance at work begins. Whether the cessation of work must be permanent is a question not susceptible of pat formulaic generalization. Where, however, the bodily impairment or injury is of the tangible quality *207 described, we have the "definite fault akin to a traumatic injury" sufficient to attach compensable status. While not entirely satisfactory either as a matter of logic or facility of application, this differentiation serves the pragmatic objective mentioned in Textileather of preserving compensation in cases where a definite time of bodily impairment is difficult to fix, while yet also permitting recovery for certain degrees of unquestionably injurious disease not necessarily accompanied by inability to work.
Where the Textileather principle is properly applicable, there may be interwoven the additionally complicating factor as to the incidence of liability where the disability to work matures after termination of employment at the place of exposure for reasons unrelated to disability to work. There may arise, moreover, the question as to whether liability for a conceded medical disability to work arising out of exposure at one place of employment is to be shared, superseded, or otherwise affected by subsequent contributory injurious exposure at another place of employment. Both of these problems will be seen to have a degree of relevance to the case at hand. We essay no comprehensive critique of the substantive law as to these matters at this point, but proceed to expose them sufficiently to facilitate understanding of the notice, limitation, and liability problems in the case.

III.
As a general matter the statute contemplates that compensation for permanent disability, partial or total, resulting from occupational disease, shall be paid in the same amount and manner and to the same persons as if the death or disability had been caused by an accident in employment. R.S. 34:15-32; and see Sutkowski v. Mutual Chemical Co., supra. Where there are successive accidental injuries in different employments which in combined effect produce a given degree of partial permanent injury, the entirety thereof will not be imposed on the second employer, the portion estimably attributable to the first employer being *208 assessed against it, even where there is no significant work interruption after the first accident. See Silberman v. National Egg & Product Co., 131 N.J.L. 286 (Sup. Ct. 1944), affirmed 132 N.J.L. 143 (E. & A. 1944) (the rule here was applied as between successive insurers of a single employer, but the principle is the same); cf. Brown v. Allied Plumbing, 20 N.J. Misc. 311 (Com. Pl. 1942), affirmed 129 N.J.L. 442 (Sup. Ct. 1943), affirmed 130 N.J.L. 487 (E. & A. 1943); Tirak v. Ford Motor Co., 24 N.J. Misc. 1 (Com. Pl. 1945). The first employer, however, bears the entire consequences of any later simple recurrence of the condition developed during employment, if causally related. Kelly v. Federal Shipbuilding & Dry Dock Co., 1 N.J. Super. 245 (App. Div. 1949); Selak v. Murray Rubber Co., 8 N.J. Misc. 838 (Sup. Ct. 1930), affirmed 108 N.J.L. 548 (E. & A. 1932). The principle discussed above must, of course, be distinguished from the settled rule that where an employment-injury activates or aggravates a pre-existing disease or weakened condition unrelated to employment causing disability, compensation is payable for the full degree of the disability or injury. Giambattista v. Thomas A. Edison, Inc., 32 N.J. Super. 103 (App. Div. 1954).
The rule of the Silberman case may be contrasted with what Dean Larson describes as the "last injurious exposure" rule, applied in some jurisdictions, under which the last insurer (or employer) bears the entire loss. 2 Larson, op. cit., supra, § 95.12, p. 472.
Apportionment of liability as between successive insurers or employers has never been expressly allowed by our courts, however, in an occupational disease situation. It was seen in II, supra, that the rule of Textileather appeared to be that as between insurers of the same employer the one on the risk when the plaintiff became "disabled" would be liable for the entire disability, regardless of the length of any prior exposure, or prior appearance of symptoms of the disease. This position was carried to its ultimate in Yurow v. Jersey Hat Corp., supra, where the second insurer bore *209 the entire burden even though it came on the risk only a few days before plaintiff stopped working, the disease (mercurial poisoning) was of long standing, and plaintiff had been repeatedly treated therefor. The Textileather case was recently cited flatly for the proposition that the last employer "in whose employment his continued exposure brought on the disability" was responsible for compensation for occupational disease, "regardless of when and where and in whose employ the disease was first contracted." Walsh v. Kotler, 43 N.J. Super. 139, 147 (Cty. Ct. 1956), affirmed 46 N.J. Super. 206 (App. Div. 1957).
That apportionment of liability nevertheless remains a theoretical possibility, at least in the "definite fault akin to a traumatic injury" type of occupational disease case, is indicated in Calabria v. Liberty Mutual Ins. Co., supra (perforated septum from chrome poisoning). The contest there was between several insurance carriers of the same employer. The proofs showed that although the employee continued to be exposed to chrome after November 28, 1946 (the last day of Liberty Mutual's coverage), his injurious condition occurred prior to that date and had remained static ever since. The court therefore held that the entire existing degree of disability was compensable by Liberty Mutual, as it was on the risk when the "disability" became fixed. It is significant, for present purposes, that the decision expressly rested on the absence of causative or contributory relationship in the subsequent exposures, the court stating (4 N.J. at page 71): "* * * there were no cumulative effects of continued exposure." The disability "arose and came to its peak" during Liberty Mutual's coverage (Ibid., 4 N.J. at page 70). The judgment was declared not to be res judicata against Liberty Mutual as to later increases in the disability "due, not to the natural progress of the existing disability, but to results of subsequent exposure to chrome poisoning" (Ibid., 4 N.J. at page 70). Thus the implications are: (a) the employer (or insurer) where a disease originates is liable for later injurious conditions which are exclusively the results of natural progression *210 of the disease, even if becoming manifest and resulting in disability to work at a later employment; and (b) a manifested "definite fault," etc., resulting in an award as against one employer, will not preclude a later award against another employer for additional injury due to additional causative exposure with that employer.
Some jurisdictions do allow, in various forms, apportionment between successive carriers and employers in occupational disease cases. 2 Larson, op. cit., supra, § 95.25, p. 477, § 95.32, p. 481; and compare the significant differences between the procedural avenues utilized to effectuate ultimate apportionment. The results reached were provided for expressly by statute, except in California where the court itself reached a decision contemplating apportionment, and the legislature subsequently established procedures implementing the decision. Colonial Ins. Co. v. Industrial Accident Commission, 29 Cal.2d 79, 172 P.2d 884 (Sup. Ct. 1946); Cal. Laws, 1951, ch. 1741.
In the light of the inferences from Calabria indicated above, it is of interest to note that in neither Textileather, Yurow, or Koval, in each of which the entire disability was attributed to the last stage of employment responsibility, and in each case a notably short one, was there a finding that the last exposure was causally related to the condition. In each the final state of the disease might very well have been due solely to the natural progression of the disease due to prior exposure. But see Walsh v. Kotler, supra, for an example of the tendency of the courts, in furtherance of the policy of liberal treatment of the employee, to strain to find causal connection of the later employment with the disease when the original employer, with whom the disease originated, is no longer amenable to recovery. Also compare McBride v. Royal Laundry Service, Inc., supra (a single employer situation), where it was held that causative exposure contributing to increased disability by employment subsequent to January 1, 1950 would be assessable to the extent only of the increase in disability, where there was a definite amount of disability (impaired hearing) prior to *211 that date, not previously compensable as an occupational disease under the statute.
From all of the foregoing, the speculative state of the law in many aspects of the problem of liability of successive employers for occupational disease is manifest

IV.
We thus arrive at the climactic assessment of petitioner's knowledge, as against the background of the substantive law, in terms of consequence of failure to notify Zusi of the claim, or to file the petition against it, until the summer of 1955. We made the point in I, supra, that in a case involving potential multiple exposures and employers, the statutory period for notice or claim does not begin to run until the co-existence of (a) knowledge (actual or imputed) by the employee of the nature of his disability and of its relation to employment with the employer-respondent, and (b) legal responsibility of that employer therefor at that time on the basis of these and any other relevant facts known to the employee. The facts which, in the statutory language, the employee "ought to have known" are, in our judgment, those which such a person as the particular employee reasonably should be expected to know, having regard to his particular background, intelligence and experience. This is the realistic criterion which accords with the purposes of workmen's compensation legislation. This is not an area for application of standards applicable to the ordinary "reasonable man," within the general tort viewpoint. Cf. Restatement of Torts, § 12, comment a.
As to the period of time until petitioner's layoff by Zusi on June 15, 1953, we are in full agreement with the conclusion of the County Court that petitioner had neither actual nor imputable knowledge that he had such a disease as silicosis. We concur in the reasoning by that court that the symptoms of cough and fever could have been regarded as attributable to many common kinds of illness. It is, of course, settled that a factual finding by the County Court *212 substantially supported by the evidence will not ordinarily be set aside by this court. Ricciardi v. Marcalus Mfg. Co., 47 N.J. Super. 90, 101 (App. Div. 1956); Augustin v. Bank Bldg. and Equipment Corp., 44 N.J. Super. 242, 243 (App. Div. 1957). Our concurrence in this finding makes it unnecessary to make a determination as to the other necessary factor for commencement of the notice period  whether, under the circumstances of petitioner's layoff (rather than quitting because of illness) a compensable condition of disability could be said to have existed as a matter of law on June 15, 1953. Quaere: Was there an "inability to work," within Textileather, supra? Cf. Belanowitz v. Travelers Insurance Co., supra.
The second significant time-stage for purposes of estimating petitioner's knowledge is October 5, 1953, just before he began work at A.P. Smith. Weighted against petitioner is the fact that he had experienced a substantial period of hospitalization during the summer, under treatment of his own physician, who was not called to testify in this case. We think it inescapable that he then knew that his condition was related to his work for respondent and other foundries. But we cannot say we are justified in overruling the County Court determination that he did not yet know what the nature of his disability was. Undoubtedly he knew he had a chest condition of some kind, but "knowledge of the nature of his disability" connotes knowledge of the most notable characteristics of the disease, sufficient to bring home substantial realization of its extent and seriousness. This we think the County Court was at liberty from the record to find did not occur until petitioner's discussion with his attorney in October 1954, not even when he was told by the foreman at A.P. Smith, in April 1954, that he had silicosis. Petitioner testified he was not told what silicosis meant, and respondent did not produce the foreman to deny this.
Circumspection must, moreover, be exercised in drawing excessively adverse inferences against petitioner from the fact of his medical treatment in 1953. Failure to diagnose this *213 disease is far from uncommon. See Ciabattoni v. Birdsboro Steel Foundry, etc. Co., 386 Pa. 179, 125 A.2d 365, 369 (Sup. Ct. 1956); Roschak v. Vulcan Iron Works, 157 Pa. Super. 227, 42 A.2d 280 (Super. Ct. 1945); 2 Gray's Attorneys' Textbook of Medicine (1951), § 147.14, p. 1596.
But even if it were required to be found that petitioner knew the nature of his disability as the result of the talk with the A.P. Smith foreman and prior information, the question remains whether that knowledge can be equated with a state of facts giving rise at that time to legal liability of this respondent, Edward A. Zusi Brass Foundry, for compensation to petitioner. If not, time did not then begin to run for notice of claim or filing of claim against Zusi, under the construction of the statutory provisions postulated above. It is clear from the factual recital at the head of this opinion that the nature of the work at A.P. Smith, from the standpoint of apparent exposure to silica dust, was substantially the same as at the previous foundries where Bucuk had been employed. He had worked at A.P. Smith for five months by then. The foreman at A.P. Smith had told him it would be better if he worked elsewhere. As noted earlier herein, he had every reason to suppose at that time that if he had a work-connected disease, the employment at A.P. Smith had contributed to it. This was an apparent factual situation to all intents and purposes evocative of the rule of Textileather, precluding any liability of prior employers and making A.P. Smith liable for the totality of the then existing disability, should petitioner then stop working, or, under the Natural Products Co. case, supra, should he shift to a job not involving the harmful exposure. Whatever we may ultimately hold in this case as to the liability of Zusi on the predicate of the showing, not known to this petitioner or his attorney prior to July 1955, that there was actually no injurious exposure at A.P. Smith, the finger of Textileather pointed, in April 1954, to liability exclusively in A.P. Smith. Consequently, on the factual picture then reasonably entertainable by petitioner, the date for the commencement of the running of the statutory *214 period for notice of claim and limitations as to Zusi did not yet eventuate.
Nor is there any basis for regarding the then existing apparent factual situation as legally equating an apportionment of liability between Zusi and A.P. Smith, or between them and Krouse-Doremus. Nothing in the Sutkowski-Calabria line of cases could have reasonably suggested to one in the position of petitioner in April 1954 that there had been anything like a "definite fault akin to a traumatic injury" during the employment at Zusi, so as to implicate a rule of apportioned liability inclusive of Zusi, under the shadowy authority of Calabria  certainly not as against the counterweight of the much closer resemblance of the situation to a Textileather complex. From the time-perspective of April 1954, the hospitalization of the summer of 1953, if to be regarded as an "inability to work," was presumably attributable under Textileather entirely to Krouse-Doremus, the stoppage of work on account of illness having occurred while working there, not at Zusi, which had laid the petitioner off. Secondly, under Calabria and Koval, the occasion for an apportionment of liability against an earlier of successive employers exists only when the disease becomes static, or arrested in development, and there was no factual basis for petitioner in April 1954 to assume that the disease had become static while he was at Zusi and had not progressed by reason of occupational exposure after he left that employer. Finally, petitioner had not yet felt compelled to cease work as a molder in April 1954 (his ultimate cessation being due to a back injury, not the silicosis), and Textileather was colorable authority against the existence of any degree of compensable permanent disability until permanent inability to work. Any one of these factors might have reasonably led to a conclusion that there was no compensable claim against Zusi as of April 1954 on the basis of what petitioner then knew or ought to have known.
Lest there be any misapprehension, we are not applying a rule excusing ignorance of law. Cf. 2 Larson, op. cit., supra, § 78.45, p. 276; In re Fells, 226 Mass. 380, *215 115 N.E. 430 (Sup. Jud. Ct. 1917). We are holding only that an injured employee or his attorney may, for purposes of compliance with statutory workmen's compensation provisions for notice of claim and limitations, assume that the substantive law is what an average reading of the pertinent adjudicative cases as of a given time would indicate the law to be  or what a reasonably defensible interpretation of such cases would indicate.
The same ultimate conclusions apply as of October 1954, when petitioner first conferred with his attorney. While we are in full agreement with the County Court that by this time petitioner had complete knowledge of the nature of his disability and of its relation to his employment, he had no less reason then than in April 1954 to suppose the liability was entirely that of A.P. Smith and not at all of Zusi; more, in fact, as there was an additional four months of presumably injurious exposure at A.P. Smith to cap the case for apparently exclusive liability of that employer, within the Textileather doctrine. There thus continued to be no apparently indicated substantive liability on the part of Zusi, and the statutory notice period did not begin to run. Petitioner's ignorance of the fact that there was actually no injurious exposure at A.P. Smith did not end until the hearing on the petition against A.P. Smith in July 1955. That ignorance was entirely excusable, and respondent does not assert the contrary. No operative date for the commencement of the statutory notice periods having arrived until July 1955, we hold that petitioner was not barred as to this respondent by either of the statutory provisions mooted herein.
We should conclude this point of the opinion with the caveat that none of the hypothecated conclusions of law which we have held reasonably entertainable by petitioner at various times necessarily constitute holdings by us as to the compensability of the conditions or liability of any employer as of any particular time. We have only been considering what petitioner may reasonably have assumed to be the law, for purposes of a determination as to whether *216 his claim should be deemed barred for non-compliance with the statute in respect to notice of claim or limitations.

V.
Respondent's final argument in support of the result in the County Court is that petitioner "failed to establish a factual premise upon which liability could attach to * * * Zusi." The argument is, as noted above, that the facts show either that "petitioner's disability largely antedated his employment with Zusi or his actual incapacity did not occur until after employment with Krouse-Doremus or A.P. Smith." While the fact may be legally immaterial, there is not lost upon the court the pervading inequity of the present assertion by the real adverse party in interest, the insurer of all of the petitioner's successive employers, that his disability is not attributable to the employment period of this respondent, after having succeeded in this and prior litigation in establishing that it was not attributable to any of the others in the chain of successive employers. The success of this kind of endeavor would make a hollow mockery of the beneficent purposes and objects of workmen's compensation legislation.
To return to the merits. For purposes of the present phase of the case it must be assumed that there was no injurious exposure at A.P. Smith. The findings and order for dismissal in the proceeding against that employer were admitted in evidence in the present case without objection, and, while they are not res judicata, they are evidence, in the absence of proof to the contrary, of the facts therein found to the effect that there was no injurious exposure at A.P. Smith, notwithstanding employment there for ten months. The assumption of this fact has been central to petitioner's position in the present case and reiterated by him throughout without contradiction at any time by respondent.
Moreover, the dismissal of the claims against Phoenix Brass and Krouse-Doremus by the Deputy Director in the present case were not appealed by respondent. Respondent's *217 present position therefore implies the hypothesis that in this kind of situation, with an unquestionably employment-connected occupational disease, there is no recovery available by the injured employee against anyone.
We conclude, first, on the record before us, that there is no legal basis to sustain the theory of a matured and fixed disability as against Phoenix Brass, as implied by respondent. Petitioner had some symptoms there but nothing to warrant the finding of a fixed disability during that employment term, within the Textileather line of cases, or of a "definite fault," etc., under the Calabria rule. It is to be emphasized that for present purposes we are in the post hac position of determining Zusi's liability in the context of its position as employment successor of Phoenix Brass, not of making a determination of Phoenix Brass' liability in insulation from later events. Cf. Walsh v. Kotler, supra.
Second, we find adequately supported in the record the determination of dismissal as to Krouse-Doremus. Petitioner's medical witness said that the exposure there was so short that it would be "speculative" to say there was a "true increase due to his exposure there." As noted above, it is implicit from Calabria and from the statute itself that there is no liability where there is in fact no injurious employment exposure. The results in Textileather and similar cases can be rationalized only on the basis that there was no proof negativing injurious exposure during the employment periods there held to implicate liability.
The finding of injurious exposure at Zusi is amply supportable on the record. Here he worked for 15 months, and in more unfavorable conditions than at the other places, near a sandblasting machine. See 2 Gray, op. cit., supra, § 147.04, p. 1585. Here occurred his first extended illness, for five weeks, which, in the light of presently available hindsight, must almost certainly have been causally related to the progressing disease. There is much to support, and nothing to refute the probability of the hypothesis that at Zusi petitioner's disease matured and reached the point from *218 which his subsequent physical deterioration was but the result of the natural progression of the disease, rather than of any further contributing injurious exposure.
In these circumstances, are we to accept respondent's argument that liability nevertheless does not attach against it by mere reason of the fact that petitioner's discontinuance of work as a molder in foundries did not cease until after his separation from respondent for reasons not connected with disability to work? Textileather is here relied upon by respondent. We think it does not control in this connection. In the present case, proceeding upon the factual situation we have found above to be applicable, we are confronted with an initial injurious and causally related employment exposure, but with disability, in the sense of inability to work at the occupation, first arising sometime after termination of the first employment, and without additional employment-related injurious exposure. On principle, the case is the same as though ultimate maturation of the disease into disability occurred while petitioner was unemployed or employed in harmless surroundings. We find no New Jersey case flatly considering this kind of situation, but we have no doubt that in such a case the employer with whom the disabling condition had its causative origin is liable for it. Any other view would be destructive of the remedy, a result manifestly not consonant with the legislative intent. 2 Larson, op. cit., supra, § 95.22, p. 474. Moreover, the alternative provisions as to notice of claim (N.J.S.A. 34:15-33), "within a period of five months after * * * the employee shall have ceased to be subject to exposure to the occupational disease," and as to limitations (N.J.S.A. 34:15-34), "within two years after * * * the employee ceased to be exposed in the course of employment with the employer to such occupational disease," strongly point to legislative contemplation that claims might be filed, notwithstanding that disability arose well after any employment-connected exposure.
Petitioner is consequently entitled to compensation at the hands of Zusi for the full extent of his permanent disability. *219 In view of the conclusions reached there is no necessity to discuss other points argued by petitioner.
The judgment of the County Court is reversed and the award made in the Division of Workmen's Compensation reinstated.