57 N.J. Super. 1 (1959)
153 A.2d 716
PHILIP PERAINO, PETITIONER-APPELLANT,
v.
FORSTMANN WOOLEN COMPANY, RESPONDENT-APPELLEE.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 1958.
Re-argued May 18, 1959.
Decided June 19, 1959.
*3 Before Judges CONFORD, FREUND and HANEMAN.
Mr. Joseph P. Piscopo argued the cause for petitioner-appellant.
*4 Mr. Verling C. Enteman argued the cause for respondent-appellee (Messrs. McCarter & English, attorneys).
The opinion of the court was delivered by FREUND, J.A.D.
The petitioner appeals from a judgment of the Passaic County Court affirming a denial of an award by the Division of Workmen's Compensation for an alleged occupational disease. The lower tribunals denied compensation solely because of lack of timely notice of claim to the employer under N.J.S.A. 34:15-33.
Petitioner was employed by the respondent as a maintenance man, truck driver, and in miscellaneous other capacities from 1925 until January 1955. Between December 5, 1953 and January 9, 1955 he was assigned to work with a "lead man," Edward Sobala, in the operation of a "fogging" machine on 11 different occasions. The fogging operation involved the use of a machine on a hand truck that sprayed a mist or vapor containing a chemical insecticide known as Tifacide, composed of halogenated hydrocarbon, methylated naphthalene, gamma isomer of benzene hexachloride and perfumer. The purpose of the fogging was to prevent and eliminate the infestation of moths and moth larvae in the employer's woolen mills located at Garfield and Passaic, N.J.
While petitioner and his "lead man" Sobala (his immediate supervisor and co-worker) were engaged in fogging, the petitioner wore a filter mask which fit snugly, by means of an elastic band, over the middle of his nose, under the eyes, and under his lower lip. The fogging was scheduled at intervals of about four months and was performed on weekends when no production was scheduled. The various rooms were sealed, and signs were posted warning against entering the rooms during the fogging process. The density of the insecticide spray was regulated by the laboratory microscopist.
It was in January 1954 when Peraino first noticed a rash on his nose at "the top of the bridge and down here * * * where the mask used to fit tight." He testified that prior to January 1954 he never had a rash on any part *5 of his body. He said that while he did not believe it to be serious, Sobala had also seen the rash and had brought it to his attention as being "from the fogging." Sobala and Peraino went to the plant clinic at about that time, and Sobala showed the plant nurse the rash and told her it was "from the fogging"  but nothing was done about it. The following month, February 1954, Peraino was at the plant clinic for treatment of an injured finger. While he was there Dr. Bongiorno, the plant doctor, observed his swollen and puffy nose and said, "Boy, you got a bad infection there." He gave petitioner some sulfa ointment to apply externally and some sulfa drugs to take internally.
In March 1954 petitioner consulted his family doctor who referred him to a skin specialist. The latter treated petitioner on about six visits. Since there was no improvement in the rash, Peraino went to see Dr. Sachs, a dermatologist, who was called as a witness on behalf of the respondent. Dr. Sachs first saw petitioner in September 1954. At about that time he developed a blotchy rash under the rib. He showed this to the plant nurse and she advised him to apply a baking soda solution at home. Petitioner testified that in November 1954 he "broke out with blotches all over my body, head, face, arms and legs, broke out all over." At that time he showed his condition to his foreman, Emil Neubert. Peraino asked him, "Possibly this could be from fogging," to which the foreman responded, "No, this couldn't be from the fogging."
In January 1955 petitioner went four times to the Skin and Cancer Unit of the New York University-Bellevue Medical Center in New York for examination, and later in the month he again became a patient of Dr. Sachs. Dr. Sachs testified that petitioner was "a very sick man," and from his examination he found that petitioner had lupus erythematosus (eruption of scaly red patches on the skin). In the latter part of January 1955 he was hospitalized at the Passaic General Hospital where he was treated by Dr. Sachs, who continued to prescribe for and treat petitioner *6 until March 1956. He said that he was familiar with Peraino's medical history. He testified that chemicals might not have been the direct cause of his condition but could have been the contributory cause, and that no one knew the real cause of lupus erythematosus.
After a leave of absence beginning in January 1955, petitioner returned to his work in September 1955 as a sweeper. He said his skin condition had improved until he went to get some mop oil from the shed where the fogging machine and insecticide were kept, following which the rash broke out on his leg.
Peraino was examined on three occasions in June 1956 by Dr. Roth, an internist, who testified the rash covered the nose and cheeks, the skin was somewhat atrophic, and the entire body was covered by a papular eruption with papules the size of coffee beans. Some of these papules were covered with scales; some were raw and bleeding. He diagnosed that petitioner had a rash of lupus erythematosus disseminatus. In a hypothetical question he was asked his opinion on whether the affliction was causally related to the employment either by way of direct causation, aggravation or acceleration. His answer was that, while the rash was not necessarily attributable to exposure to the chemicals, he believed that "the exaggeration of the rash * * * was due to exposure to the irritant chemicals." His opinion was, in effect, that Peraino originally had a small, localized, nonwork-connected disease which became "profound" and disseminated by virtue of the employment. He explained that lupus erythematosus is a disease of the skin and that contact with the chemicals used in the fogging operation sensitized petitioner with the result that the rash became generalized and he began to have systemic manifestations of the disease. His opinion was based partially upon the elevation of the white blood count and the increased sedimentation rate. He said exposure to the chemicals is known to cause acceleration and exacerbation of lupus erythematosus.
*7 Dr. Irving Shapiro, a dermatologist, examined petitioner in August 1955 and in June and October of 1956, and testified that petitioner presented a "widespread eruption * * * scattered over his face, scalp, chest, back, arms and legs." It was his opinion that Peraino was suffering from a toxic reaction of his skin due to exposure to and inhalation of poisonous fumes while at this work. He further said it was causally related to his exposure while fogging at respondent's plant. He was familiar with the chemical components of Tifacide and said they were primarily irritants and severe protoplasmic poisons. He did not agree with the diagnosis that petitioner was suffering from lupus erythematosus. It was his opinion that petitioner's exposure to noxious poisons had caused changes in his body which manifested themselves on his skin.
Dr. Bart James, whose specialty is dermatology, examined petitioner on December 12, 1955 at the request of respondent. It was his opinion that the condition from which petitioner was suffering when he examined him was not occupational since he wore a respirator and would not inhale any of the fumes. He testified that petitioner did not have a contact dermatitis. When given the chemical component parts of Tifacide, he said it would in no way cause or aggravate petitioner's skin condition, but from the formula given him he said it could in certain individuals cause a contact dermatitis. He said that he made two provisional diagnoses of seborrheic eczema or lupus erythematosus of the discoid type. It was his opinion that lupus erythematosus is a systemic condition, does not have external origin, but can affect the skin. He conceded that the component parts of Tifacide are toxic and adversely affect the skin and that exposure to chemicals could aggravate a pre-existing lupus erythematosus.
The petition for compensation was filed July 26, 1955. No written claim for compensation was theretofore made upon the employer. The notice provisions of the statute read as follows:
*8 "Unless the employer during the continuance of the employment shall have actual knowledge that the employee has contracted a compensable occupational disease, or unless the employee or someone on his behalf, or some of his dependents, or someone on their behalf, shall give the employer written notice or claim that the employee has contracted a compensable occupational disease, which notice to be effective must be given within a period of five months after the date when the employee shall have ceased to be subject to exposure to the occupational disease, or within ninety days after the employee knew or ought to have known the nature of his disability and its relation to his employment, whichever period is later in duration, no compensation shall be payable on account of the death or disability by occupational disease of the employee."
It is conceded by petitioner he failed to give the required timely notice, but he contends the employer had "actual knowledge" within the meaning of the statute. Both the Division of Workmen's Compensation and the County Court dismissed petitioner's petition for lack of notice, holding that the respondent employer did not have actual knowledge that petitioner had contracted a compensable occupational disease; hence the present appeal.
On September 17, 1958 we heard the oral argument on this appeal. We reviewed the respective arguments and on September 29, 1958 filed an opinion remanding the cause to the deputy director with instructions to make more precise findings of fact on certain questions bearing upon the employer's knowledge of petitioner's skin condition. On January 19, 1959 the deputy director submitted his findings to the proposed questions, as follows:
"(1) Did any conversation ensue between petitioner and Mr. Sobala concerning the petitioner's nose rash? If so, was the conversation substantially as related by petitioner?
(A) On page 22 of the record petitioner testified: `I went in there with the lead man. He's telling me that's from the fogging, he's telling me, and he told the nurse in the plant that it's from the fogging.'
This man was Sobala (page 7), but on page 294 Sobala denies seeing a rash until petitioner was to enter a hospital (page 359). The conversation is denied by Sobala and I find it was not as told by petitioner.
*9 (2) Did petitioner point out any skin rash to any nurse employed by respondent either early in 1954 or in November, 1954?
(A) On page 23, `A. Oh, by the nurse because the lead man had spoken to the nurse about my nose.' On page 24, `Q. What was it that was pointed out to the nurse? A. The infection on my nose. Q. Who pointed it out? A. The lead man.'
(3) Did petitioner mention his skin rash to Dr. Bongiorno?
(A) On page 24, `Q. What was the purpose of your visit there? A. Well, I went there for my finger, what it was, and I attracted the doctor's attention to my nose. Q. Who was the doctor? A. Dr. Bongiorno.' On page 25, `Q. What was the condition of your nose? A. Well, it was swollen and puffy. The doctor looked at it and said, "Boy, you got a bad infection there," he said.'
(4) Did petitioner mention his skin rash to Mr. Neubert, and is petitioner's version of the conversation true?
(A) On page 26, `Q. What did you notice thereafter? A. After, well, November 27th, I think it was the twenty-seventh, I broke out with blotches all over my body, head, face, arms and legs, broke out all over. Q. November 27th? A. Yes, around that date. Q. Of 1954? A. Of '54. Q. Yes? A. Well, I showed it to my foreman. Q. Who was your foreman? A. Emil Neubert, N-e-u-b-e-r-t.' On page 27, `Q. What did he do? A. I said, "Possibly this could be from fogging." Q. What did he do about it? A. He said, "No, this couldn't be from the fogging."'
Mr. Neubert was not called as a witness and I accept the statement of petitioner as true."
On the following April 2 the deputy director made supplemental findings to questions 2 and 3, as follows:
"(2) Did petitioner point out any skin rash to any nurse employed by respondent either early in 1954 or in November, 1954?
(a) From the record as quoted in my original `Supplemental Findings,' I specifically find that the rash on petitioner's nose was pointed out to the nurse by petitioner's lead man in his presence.
(3) Did petitioner mention his skin rash to Dr. Bongiorno?
(a) I specifically find that he did, it was swollen and puffy."
Subsequent to our receiving the supplemental findings and at the request of counsel, we heard further oral argument on the subject matter of the questions propounded and the answers given in reply. There was also argued the issue of whether petitioner's disease was due to a cause arising out of and in the course of his employment.
*10 It has frequently been held in the field of workmen's compensation that the statute must be liberally construed to serve its humane purpose and to avoid harsh results. Panchak v. Simmons Co., 15 N.J. 13, 16 (1954). The comparable notice of claim provision for accidental injuries, R.S. 34:15-17, which also excuses notice by the employee where the employer has "actual notice" of the occurrence, has been construed to mean that the employer need not have positive or first-hand knowledge; it suffices "that his supervisory employees have been duly made aware of circumstances which, in common parlance, would indicate knowledge of the occurrence of the injury"  in other words, sufficient to put the employer on inquiry. Panchak v. Simmons Co., supra, 15 N.J. at pages 16-17; Goldstein v. Continental Baking Co., 16 N.J. 8, 12-13 (1954); Gamon Meter Co. v. Sims, 114 N.J.L. 590, 593-594 (Sup. Ct. 1935); Roberts v. Beitler, 34 N.J. Super. 470, 476 (Cty. Ct. 1955); Mitchell v. Mucon Corp., 51 N.J. Super. 208, 213-214 (Cty. Ct. 1958).
The employer argues that the Panchak rule does not control in an occupational disease case because R.S. 34:15-17 refers to "actual knowledge of the occurrence of the injury" whereas N.J.S.A. 34:15-33 refers to "actual knowledge that the employee has contracted a compensable occupational disease." The latter section, it is said, therefore requires not only that the employer know of the contraction of the disease but also of its compensable nature. We regard this position as unfounded and as an unwarrantably narrow construction. The statutory reference to "compensable disease" is simply to identify the disease. If the Legislature meant knowledge that the disease was of such a nature and of such connection with the employment as to make it compensable, it would undoubtedly have used the very apt language indicative of exactly such a situation which it has, in fact, used in the same section in describing the kind of knowledge by an employee which will cause the notice period to run against him. It is our judgment that the kind and *11 degree of actual knowledge by the employer held sufficient in the Panchak case, supra, to excuse notice of claim by an employee in an injury case will suffice for the same purpose in an occupational disease case under N.J.S.A. 34:15-33.
Petitioner first noticed the rash on his nose in January 1954. The rash was discernible to his "lead man," to his foreman, and to the plant nurse, all of whom saw it, and Dr. Bongiorno, the plant physician, actually treated the rash the following month. It may well be that the nurse and Dr. Bongiorno did not appreciate the serious nature of the condition, but they knew of petitioner's infected nose. In view of the specific findings of the deputy director as to the conversations had with the supervisory personnel mentioned, we find that the notice provisions of the statute have been satisfied. It is clear that respondent acquired actual knowledge of his physical disability, whatever it is determined to have been, during the continuance of the employment.
We pass to consideration of the issue of causal connection between the work done and the disease. Although the lower tribunals did not reach this question, the parties have agreed that we should dispose of it, if necessary to make a final determination. It is fundamental that the employee has the affirmative burden of establishing by a preponderance of the credible evidence that his disease was work-connected and was caused or contributed to by causes and conditions arising out of and in the course of his employment. Green v. Simpson & Brown Const. Co., 14 N.J. 66, 69 (1953); Mergel v. New Jersey Conveyors Corp., 14 N.J. 609, 614 (1954). The proof may be direct, circumstantial or presumptive. Green v. Simpson & Brown Const. Co., supra, 14 N.J. at page 69. The accepted standard of proof is merely that the evidence establishes causal connection with probability, not certainty. Reynolds v. General Motors Corp., 40 N.J. Super. 484, 488 (App. Div. 1956); Masko v. Barnett Foundry & Machine Co., 53 N.J. Super. 414, 423 (App. Div.), certification denied 29 N.J. 464 *12 (1959); Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533, 538 (Sup. Ct. 1939).
Resolution of the issue of causation necessarily depends upon the credibility of the witnesses. As noted above, neither the deputy director nor the County Court made any findings of fact as to causation. However, the issue was fully briefed and argued, and the proofs are adequate for us to determine the question in the exercise of our original jurisdiction. R.R. 1:5-4(b); 2:5. We have made a complete investigation and analysis of the voluminous record on this appeal to determine and evaluate the facts. Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958); Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 447 (1958).
The issue to be resolved is whether or not there was in fact a causal relationship, at least to the extent of contribution or aggravation, between the fogging done by Peraino and the development of the skin disease, which eventually broke out in blotches all over his body, accompanied with an itching feeling, lasting for an extended period of time.
The medical testimony, discussed supra, was in dispute as to the nature of petitioner's disease and whether or not it was work-connected in origin. But there was no dispute that he had some physical disability after participating in the fogging. The consensus of the medical testimony is that the fogging operation did not actually cause the inception of petitioner's disease, but the medical experts practically all agreed that it did aggravate his skin affliction. Dr. Roth testified that in his opinion exposure to the chemicals used in the fogging did not directly cause petitioner's disease but it did exacerbate and aggravate his condition. Dr. Sachs, petitioner's treating physician, did not believe the chemicals caused the disease but he said they could have been the contributory cause. Dr. James, respondent's expert, agreed basically with Dr. Sachs and conceded that the component parts of Tifacide are toxic and could aggravate the skin condition.
*13 We therefore are satisfied that Peraino sustained the burden of proof of causal relation between his employment with respondent and the disability he later sustained. We find that his exposure to the irritant toxic chemicals he was required to use while performing his assigned duties aggravated an existing skin condition and accelerated the progression of the disease. Petitioner thereby acquired a compensable occupational disease within the meaning of the statute. Gamon Meter Co. v. Sims, supra; Giambattista v. Thomas A. Edison, Inc., 32 N.J. Super. 103, 114-115 (App. Div. 1954); Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 208-209 (App. Div.), certification denied 27 N.J. 398 (1958).
The judgment under review is reversed and remanded to the Division of Workmen's Compensation for the purpose of making an award to petitioner.