78 N.J. Super. 505 (1963)
189 A.2d 459
CHARLES BOND, PETITIONER-RESPONDENT AND LIMITED APPELLANT,
v.
ROSE RIBBON & CARBON MFG. CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 1963.
Decided March 26, 1963.
*506 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Stanley J. Perwin argued the cause for appellant Rose Ribbon & Carbon Mfg. Co., by its insurance carrier, Insurance Company of North America (Messrs. Schneider, Lustbader & Morgan, attorneys; Mr. Henry G. Morgan, of counsel; Mr. Perwin, on the brief).
Mr. Isidor Kalisch argued the cause for respondent Manufacturers Casualty Insurance Co.
Mr. Seymour B. Jacobs appeared for limited appellant Bond (Messrs. Balk & Jacobs, attorneys; Mr. Jacobs, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Petitioner Bond received an award of temporary disability and 20% partial permanent disability in the Workmen's Compensation Division, to be paid by the Insurance Company of North America (North America), and not by New Jersey Manufacturers Casualty Insurance Co. (Manufacturers), a subsequent carrier on the risk. The County Court affirmed and North America now appeals to this court. Petitioner takes a limited appeal to preserve its rights in the event we determine that Manufacturers is liable jointly, severally or in the alternative with North America. Neither insurer challenges the award. The sole question to *507 be determined is which of the two carriers is to pay. Determination of this question requires a close review of the record.

I.
Rose Ribbon & Carbon Mfg. Co. manufactures carbon paper and teletype and typewriter ribbons. Petitioner was in its employ as an ink maker from July 1950 to May 1951, and from September 1952 until April 18, 1958. His work consisted of mixing colors by putting powdered ink into a mixing machine. He would bring the powdered ink, composed of crystalline violet, brilliant green and fuchsine red dyes, from the plant warehouse in barrels and scoop it into the mixer. He would empty five or six barrels a day. The dust from the scooping and mixing would get into his mouth, nose and ears, making him cough and sneeze. The powder would even permeate the mask he wore, as well as his clothes. Part of his work consisted of carrying two tubs of hot ink each day to the workbench of a fellow employee, Thelma Glasico, and the hot mix would give off fumes and an odor. (The compensation claim of Mrs. Glasico is the subject of a companion appeal, A-918-61, decided this day.)
Petitioner went to see Dr. Samuel A. Shapiro in mid-January 1956, complaining of a cough and chest pain. He had a temperature, and Dr. Shapiro gave him a note for his employer stating that petitioner "should not work where there is dust or fumes which he inhales directly." Petitioner continued working until June 10, 1957, when he was confined to bed for a week. Dr. Shapiro saw him and diagnosed his condition as virus infection, respiratory type. Petitioner returned to the plant on June 17.
On December 6, 1957 a mobile unit of the Hudson County Tuberculosis and Health League took a routine 70 mm. X-ray of petitioner. Dr. Leo Horowitz read the X-ray and reported:
"Suspect Tuberculosis  Questionable density left 1st anterior interspace and left 3rd anterior rib. Further study with 14 x 17 [14" x 17"] film"
*508 A copy was sent to Dr. Shapiro, and the League also wrote to petitioner directing that he consult his doctor. Petitioner testified he did so later in December and was advised by Dr. Shapiro to report to the Board of Health and have the X-ray taken over again.
Dr. Shapiro testified for petitioner. He had to rely on memory because he had lost his records as well as the December 6 X-ray film. He said he had not felt it necessary to send his patient for X-rays when he saw him in January 1956 or in June 1957. He vaguely remembered seeing petitioner in December 1957 after receipt of the mobile unit's film, and sending his patient to get a sputum examination at the city dispensary. Asked if he was aware of the presence of tuberculosis when petitioner saw him on that occasion, he replied, "I wouldn't make the diagnosis of tuberculosis without a positive sputum and a positive X-ray."
Petitioner did not go to the city clinic as advised, but continued to work until the League alerted the Newark Department of Health concerning his condition. He was X-rayed at the clinic on April 17, 1958, at which time he was found to have "active pulmonary tuberculosis with an infiltrate in the left upper lung field with suspicious cavitation. Sputum examination is positive." He was placed on chemotherapy until his admission to the Verona Sanatorium at the end of May 1958 for observation of pulmonary pathology. X-rays taken two months later revealed a continuing tubercular condition. Petitioner was discharged from Verona August 4, 1958, the final diagnosis being "Tuberculosis, pulmonary, minimal, bilateral." Two days later he was admitted to the Veterans Administration Hospital where he remained until discharged from treatment on January 28, 1959 with a diagnosis of "pulmonary tuberculosis, minimal, inactive."
By stipulation of counsel the testimony given in Glasico v. Rose Ribbon & Carbon Mfg. Co.  particularly by Newton I. Sax and John P. Brady, industrial toxicologists, and by two of the company's employees, regarding physical conditions at the plant  was made part of the record in this case. The *509 parties have also stipulated that North America was on the risk until March 24, 1958, at which time Manufacturers became the carrier. (The Glasico record indicates that North America had become the compensation carrier in 1955.)
Sax testified that crystalline violet, in powdered form, was very irritating to lung tissue. Petitioner was also exposed to ethylacetate, cellosolve, sodium bisulfite and potassium permanganate. Without detailing Sax' testimony, suffice to say that all four are irritating to the lungs.
Dr. Saul Lieb was petitioner's medical expert, and Dr. Albert B. Tucker appeared on behalf of Manufacturers. Dr. Lieb had examined petitioner on March 21, 1959 and October 27, 1960. On both occasions he found the tuberculosis arrested. Disability was estimated at 30% of total. In answer to the hypothetical question he testified that petitioner's tuberculosis was causally related to his employment. In his opinion petitioner's exposure to the various dyes and chemicals of his employment environment irritated the bronchial tubes and respiratory tract and "caused chemical and allergic irritation and produced the bronchitis and increased coughing, and these factors combined to be the competent producing cause of a pre-existing dormant tuberculosis and caused it to become active and spread." Another factor was his daily exposure to a fellow worker, Mrs. Glasico (the hypothetical question stated that she "was found to have tuberculosis in December of 1957"), thus affording an opportunity to contract the disease directly from her.
Dr. Lieb's testimony on cross-examination obviously played an important part in the determinations of the two lower tribunals, and we therefore examine it closely. Counsel for Manufacturers asked him to assume, among other facts, that petitioner's personal physician, Dr. Shapiro, had indicated in January 1956 that "because of pathology in his lungs" he should not work where there was any dust or fumes which he inhaled directly. There was no such proof, either in the testimony or in Dr. Shapiro's note to the employer. Dr. Lieb was also asked to assume that Dr. Horowitz, who had read *510 the mobile unit's 70 mm. film, had "indicated that there was tuberculosis present as of this date, December 6th, 1957." Dr. Horowitz' report, quoted earlier in this opinion, did not state that tuberculosis was present; it merely said, "Suspect tuberculosis  Questionable density * * *." The witness was also told that Dr. Irving Willner, who was Director of the Chest Disease Bureau in the Newark Health Department, "in studying the plates [sic] of December 1957, and the X-rays apparently taken subsequent thereto, the larger plates, indicated that the plate revealed active pulmonary tuberculosis with an infiltrate in the left upper lung field with suspicious cavitation." There is no proof that Dr. Willner ever saw the December 1957 single film.
Based on respondent Manufacturers' hypothetical question, including the erroneous statements just mentioned, Dr. Lieb testified, "I would say from the facts you have given me, that the first definite indication of active tuberculosis would be on the X-ray of December 6, 1957." The opinion so expressed could have no more validity than the hypothetical question upon which it was based. Since Dr. Lieb was asked to assume facts which were neither admitted nor proved, his opinion, so completely lacking in proper and necessary foundation, carries little if any weight. Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305 (1954).
Dr. Lieb could not say how long prior to December 6, 1957 the condition had been active; he ventured the statement that "If it had been active on December 6th, it would have been active for an unknown period of time before it was known to be active." (Italics ours.) In Dr. Lieb's opinion, "Anyone with active tuberculosis has a temporary disability of 100 per cent of total on the basis that they should not be working and should be under treatment." Untreated, the condition would probably continue to get worse.
Dr. Tucker examined petitioner on February 12, 1959, took X-rays, and concluded that he had an inactive pulmonary tuberculosis. Counsel for Manufacturers then posed a hypothetical question to the witness which we find reasonably *511 accurate except for one statement wherein reference was made to the Newark Board of Health sputum studies (of April 17, 1958). Counsel stated that "the X-ray diagnosis of December 7th [6th], 1957 was confirmed by the positive sputum studies." (Italics ours.) Dr. Horowitz made no "diagnosis"; indeed, the Hudson County Tuberculosis and Health League program consultant specifically testified that Dr. Horowitz was a roentgenologist, and his report was a reading, not a diagnosis. We are also critical of the use of the word "confirmed." The April 17, 1958 city clinic X-rays and sputum tests constituted an independent study which did not purport to confirm anything.
Based on the facts supplied in the hypothetical question, Dr. Tucker was of the opinion that petitioner developed active disease during the last half of 1957: the April 17, 1958 X-ray was "unequivocal evidence of disease which has been quite active and has cavitated." The presence of active tuberculosis, he said, was a mandate for inactivity and rest, and a person suffering from that condition would be totally disabled. Dr. Tucker said he held to the view that tuberculosis is "a specific disease which can be caused only by specific exposure to open cases of tuberculosis, such as one finds either in the sanatorium or hospital environment." Since this situation did not prevail at the plant, it was his opinion that there was no specific tuberculosis hazard in what petitioner did, and hence no causal relationship to his work.
Dr. Tucker was of the further opinion that the dust particles to which petitioner was exposed did not aggravate or in any way accelerate a tubercle bacillus breakdown into active tuberculosis. He persisted in this opinion on cross-examination: petitioner's constant exposure to dust for as much as five years, causing him to cough and sneeze continually, would not aggravate or activate his tuberculosis, unless it could be demonstrated that there was an agency present in the dust capable of producing pulmonary change. Asked if daily exposure to a fellow employee found to have active tuberculosis would bring on petitioner's condition, he replied: "Theoretically, *512 this could be." Dr. Tucker admitted that tuberculosis is a progressive type disease until arrested; petitioner's condition had progressed during the second half of 1957 and the first half of 1958, but he did not know when it reached a plateau.
The judge of compensation found that petitioner inhaled dust at work, sufficient in nature and degree to bring about a breakdown and spreading of a pre-existing latent tuberculosis. His disability, he said, was "specifically demonstrable and cognizable on X-ray at the end of 1957." Although exposure to the work environment continued thereafter, the compensation judge concluded that petitioner's disability "arose and came to its peak" during the period between the beginning of his employment in 1950 and the end of 1957. Accordingly, he determined that full liability should be assessed against North America, and Manufacturers absolved of liability on the claim.
On appeal the County Court judge, after briefly reviewing the facts and some of the occupational disease cases, concluded that petitioner met with "an accident in the nature of an occupational tuberculosis" (sic) while in Rose Ribbon's employ between July 9, 1950 and the end of 1957, so that the employer became liable during North America's coverage. He said nothing about the tuberculosis having reached a peak at any particular time.

II.
Neither North America nor Manufacturers has raised the question of whether the activation of petitioner's latent tuberculosis because of exposure to his work environment is a "compensable occupational disease" within the definition of N.J.S.A. 34:15-31, which reads:
"For the purposes of this article, the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, *513 process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment."
Tuberculosis, as Dr. Tucker testified and as medical experts have time and again testified in other cases, is of tubercle bacillus origin. Unless petitioner's tuberculosis was acquired as a result of exposure to the germ in the course of his employment, it cannot, in the strictest sense, be considered a "disease" occupationally acquired. (In this connection, we do not overlook the fact that there was some testimony of petitioner's exposure to his co-worker, Mrs. Glasico. However, neither of the lower tribunals based the award upon such an exposure; Dr. Lieb referred to it as a possible second reason for his opinion that there was a causal relation, and Dr. Tucker spoke of the exposure as "theoretically" possible. But we need not pursue the matter any further because, as appears from the record in Mrs. Glasico's case, she was first employed by Rose Ribbon on April 18, 1956, some six years after petitioner. At that time she had diabetes and was under doctor's care. On the other hand, it is to be recalled that when petitioner visited Dr. Shapiro in January 1956, he had a temperature, cough and chest pains. Petitioner, therefore, was not exposed to a tubercular condition in Mrs. Glasico; if there was exposure at all, it would have been Mrs. Glasico to petitioner's tuberculosis.)
Although petitioner's latent tuberculosis was not a "disease" produced by the dust and fumes of his work, it was activated by them and therefore compensable within the liberal expansion our courts have given to the occupational disease concept. See Giambattista v. Thomas A. Edison, Inc., 32 N.J. Super. 103, 111 et seq. (App. Div. 1954), reversing 29 N.J. Super. 395 (Cty. Ct. 1954) (basic fungoid condition of hands, nonoccupational in origin, aggravated by immersion in benzine, held compensable as an occupational disease); Reynolds v. General Motors Corp., 40 N.J. Super. 484 (App. Div. 1956), affirming 38 N.J. Super. 274 (Cty. Ct. 1955) (lighting-up of latent tubercular condition by irritation *514 caused by inhalation of dust from grinding operation); Bober v. Independent Plating Corp., 28 N.J. 160 (1958) (chrome dust activating latent predisposition to allergic bronchial asthma). The court in Giambattista said that the word "disease" is to be construed in the broad and generic sense of "any departure from the state of health presenting marked symptoms" (32 N.J. Super., at page 113), and that has been the enlightened interpretation given to the occupational disease provisions of our Compensation Act ever since. See, in this connection, 1 Larson, Workmen's Compensation Law, § 41.40 et seq., pp. 604-613 (1952) and 1962 Cum. Supp., p. 310 et seq.

III.
In arguing for affirmance of the County Court judgment directing that North America pay the compensation awarded, Manufacturers asserts that petitioner had active tuberculosis in December 1957 or prior thereto, and was then 100% totally disabled. It contends that petitioner was at that time suffering from a tangible bodily impairment, specifically demonstrable, and his condition had become definitely measurable, fixed and arrested. The first part of this contention originates in Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 206 (App. Div. 1958), certification denied 27 N.J. 398 (1958), and the latter part in Brooks v. Bethlehem Steel Co., 66 N.J. Super. 135, 146 (App. Div. 1961), certification denied 36 N.J. 29 (1961). In Bucuk Judge Conford undertook an extensive consideration of the cases dealing with the time when compensation liability attaches where there are successive employments or a succession of carriers insuring the same employer. Detailed analysis was in particular given to Textileather Corp. v. Great American Indemnity Co., 108 N.J.L. 121 (E. & A. 1931), and Calabria v. Liberty Mutual Ins. Co., 4 N.J. 64 (1950). Textileather held that disability on account of an occupational disease does not arise, notwithstanding the extent of *515 the internal ravages of the disease, until the employee dies or is incapacitated from work. That was a case of benzol poisoning where there was no tangible manifestation of physical impairment. Eventually, in the Calabria case, our courts dealt with a disability where the manifestation was so tangible that the Textileather doctrine could not properly be applied. In Calabria petitioner's disability consisted of an aperture in the nasal septum due to exposure to chrome fumes and dust. The employer had been successively insured by three carriers during his employment. The court held the first insurer liable even though petitioner continued to work after it had gotten off the risk, and this for the reason that the perforation of the septum became static while that company was the insurer. The late Justice Case, speaking for the court in Calabria, recognized the perforation to be a permanent disability in that "it is a loss of physical function and detracts from the former efficiency of the body or its members in the ordinary pursuits of life, even when unaccompanied by present incapacity for work." The formula for liability laid down under the facts of that case was that "the status of compensable disability from such an occupational disease as chrome poisoning may be attained when, as here, a definite fault akin to a traumatic injury occurs." (4 N.J., at pages 70-71)
In Bucuk Judge Conford sought to articulate the distinction between the Textileather and Calabria lines of authority as follows:
"* * * When the disease is of a nature which is gradually progressive and does not manifest the kind of tangible bodily injury or impairment which is specifically demonstrable, and cognizable even by a layman, but takes its toll in a general over-all condition of malaise eventually forcing discontinuance of work at the injurious occupation, the inception of compensable status is when such discontinuance at work begins. Whether the cessation of work must be permanent is a question not susceptible of pat formulaic generalization. Where, however, the bodily impairment or injury is of the tangible quality described, we have the `definite fault akin to a traumatic injury' sufficient to attach compensable status. While not entirely satisfactory either as a matter of logic or facility of application, *516 this differentiation serves the pragmatic objective mentioned in Textileather of preserving compensation in cases where a definite time of bodily impairment is difficult to fix, while yet also permitting recovery for certain degrees of unquestionably injurious disease not necessarily accompanied by inability to work." (49 N.J. Super., at pages 206-207)
In Brooks v. Bethlehem Steel Co., above, we dealt with a case of pulmonary emphysema found to be causally work-connected. Petitioner was first employed in 1946 and his symptomology began about Christmas 1948, continuing thereafter. He was not examined for his condition until August 1954, despite heavy wheezing, coughing and continuous bleeding from throat or nose. The diagnosis was emphysema. There were re-examinations in 1957 and 1958, but the medical testimony was that the condition remained static during the 1954-1958 period. The proofs showed that at least by 1954 petitioner's condition had reached a plateau of arrested development and remained constant thereafter, and that he was entitled to permanent partial disability as of that date despite the fact that he continued working. It was against this background that we said:
"* * * [I]n a case of the internal, gradually progressive type of occupational disease (atypical of the ordinary `definite fault,' etc. situation), once the condition has become definitely measurable, fixed and arrested, notwithstanding the petitioner remains able to work at the same job, it must be assimilated to the category of the `definite fault akin to a traumatic injury' and become compensable to the extent of the partial permanent disability then attained. It should be noted that the rule we are declaring will not compel awaiting the fullest progression of the disease in order to apply for compensation where there is previously a sufficient bodily impairment to constitute a true `definite fault akin to a traumatic injury'; e.g., impairment of hearing, as in McBride v. Royal Laundry Service, Inc., supra, 44 N.J. Super., at page 117; or a perforated septum, as in Calabria v. Liberty Mutual Insurance Co., supra, 4 N.J., at p. 70." (66 N.J. Super., at page 146; italics in text.)
We find nothing in the proofs to sustain the compensation judge's conclusion that petitioner's disability  the lightingup of his pre-existing latent tuberculosis  was "specifically *517 demonstrable and cognizable" on the December 6, 1957 X-ray. The judge did not have the small film before him  it had been lost  and no one testified on the basis of an inspection of that film. He had only the report of Dr. Horowitz wherein, to repeat, after reading the film he noted, "Suspect tuberculosis  Questionable density," etc. Dr. Shapiro, claimant's personal physician, would say no more than that he would not, when petitioner saw him late in December 1957, make any diagnosis of tuberculosis without a positive sputum and a positive X-ray. He never testified to a specifically demonstrable and recognizable tuberculosis.
Nor do we find any support for the compensation judge's conclusion that petitioner's disability "arose and came to its peak" during the period between July 9, 1950 and the end of 1957. No one testified that an active tuberculosis had reached a plateau or a peak in that period which, it may incidentally be noted, covered a long span of 7 1/2 years. The "peak" of which the compensation judge spoke could, within the frame of reference of the language he used, have occurred even before North America came on the risk in 1955.
Turning to the County Court determination, we again find no support in the record for the judge's conclusion that petitioner met with "an accident in the nature of an occupational tuberculosis"  an awkward and rather meaningless phrase  and this between July 9, 1950 and the close of 1957, the same period fastened upon by the Division hearer. The county judge did not speak of any peak or plateau.
However suspect the condition shown on the small X-ray film taken by the League's mobile unit, the fact is that there is nothing in the record to show there was an active tuberculosis present. For all we know, what the film showed was the physical evidence left by the pre-existing, latent and temporarily arrested tubercular condition. Just when that condition flared into active being so as to "manifest the kind of tangible bodily injury or impairment which is specifically demonstrable, and cognizable even by a layman" (Bucuk, above, 49 N.J. Super., at page 206), we do not know. We *518 do not have a date when "a definite fault akin to a traumatic injury" (Calabria, above, 4 N.J., at page 71) occurred. Certainly we do not have here the physical condition present in the Brooks case, "definitely measurable, fixed and arrested." None of the testimony, including that adduced by Manufacturers, the second insurer, establishes just when petitioner's active tuberculosis met the standards required in the cases just cited. All we know is that it was present on examination at the city clinic on April 17, 1958, but not that it was demonstrable, measurable or fixed, to the knowledge of the employer, employee, or anyone else before that date.
Manufacturers argues it is inequitable that the whole burden of compensation fall upon it as the last insurer, for it had been on the risk only a month when petitioner, on order of the Newark Board of Health, had to leave his job and enter the sanatorium. Such, however, is the policy implicit in the Textileather line of cases. See, for example, Masko v. Barnett Foundry & Machine Co., 53 N.J. Super. 414 (App. Div. 1959), certification denied 29 N.J. 464 (1959) (silicosis activating a dormant tuberculosis); Biglioli v. Durotest Corp., 26 N.J. 33 (1958), affirming 44 N.J. Super. 93 (App. Div. 1957) (progressive berylliosis culminating in total permanent disability).
The only testimony we have as to the measure of positive disability on December 6, 1957 is Dr. Lieb's, who said that if petitioner's tuberculosis was then active, there was a temporary disability of 100% and he should not have been working but undergoing treatment. Dr. Tucker, too, said that the presence of active tuberculosis is a mandate for inactivity and rest. Again we note that there were no clinical findings with reference to the exact nature of petitioner's condition in December 1957. Dr. Lieb's testimony on that point was based upon an hypothetical question containing factual inaccuracies; Dr. Tucker's was a conclusion arrived at by hindsight, based on the April 1958 city clinic X-ray.
The fact is that no one knew before April 17, 1958 that petitioner had active tuberculosis. He continued to work *519 until that date without interruption, as he had in the past with the single exception of a week in June 1957. The medical testimony is that a latent tuberculosis is harmfully affected by dust and fumes such as those to which petitioner was exposed, and that his condition must have worsened until sanatorium confinement and treatment. It may be that the measure of petitioner's disability could have been determined in April 1958. It was not, and all we have is the testimony of Dr. Lieb, who examined petitioner in March 1959 and arrived at a 30% total permanent estimate of disability, and the testimony of Dr. Tucker, who gave an estimate of 5% exclusive of cause, based upon his examination of February 1959.
In the light of our review and careful analysis of the testimony (Russo v. United States Trucking Corp., 26 N.J. 430 (1958)), we conclude that the Division and the County Court wrongly allocated liability for compensation payments to North America, and that Manufacturers, the insurer of the risk at the time petitioner had to quit work, is liable.
Reversed, with the direction that judgment be entered in accordance with this opinion. No costs as to petitioner.