244 N.J. Super. 149 (1990)
581 A.2d 1318
SAMUEL J. CALABRO, PETITIONER-RESPONDENT,
v.
CAMPBELL SOUP CO., RESPONDENT-APPELLANT.
LEON S. BIALKOWSKI, PETITIONER-RESPONDENT,
v.
CAMPBELL SOUP CO., RESPONDENT-APPELLANT.
JAMES MALANDRO, PETITIONER-RESPONDENT,
v.
CAMPBELL SOUP CO., RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1990.
Decided September 18, 1990.[*]
*151 Before Judges MICHELS, DEIGHAN and BROCHIN.
Steven G. Fannon argued the cause for appellant Campbell Soup as insured by N.J. Manufacturers Ins. Co. (Capehart & Scatchard, P.A., attorneys; Bruce A. Wallace, III and Steven G. Fannon on the briefs).
William T. Freeman argued the cause for appellant Campbell Soup as insured by Liberty Mutual Ins. Co. (Freeman, Barton, Freeman & Huber, attorneys; William T. Freeman on the briefs and reply briefs).
Seth K. Shaine appeared for respondents (Molotsky, Rabkin & Schwartz, attorneys; Seth K. Shaine on the briefs).
The opinion of the court was delivered by DEIGHAN, J.A.D.
This is an appeal from determinations in three workers' compensation cases. Petitioners Samuel J. Calabro, Leon S. Bialkowski, and James Malandro (petitioners), were employees of Campbell Soup Company (Campbell) who were exposed to *152 loud occupational noises over a period of years. They each filed claim petitions against Campbell for the resulting loss of hearing. Campbell was insured with N.J. Manufacturers Insurance Co. (NJM) from 1912 to July 31, 1979 at which time Liberty Mutual Insurance Co. (Liberty Mutual) became the insurance carrier. Liberty Mutual was found liable for the full amount of the award to each petitioner. This appeal essentially involves a dispute between the carriers. Liberty Mutual contends that the awards should be apportioned between the carriers.
On November 20, 1981, petitioner Calabro filed two workers' compensation claim petitions against respondent Campbell. On September 23, 1983, petitioner Bialkowski also filed two claim petitions against Campbell. Lastly, on June 11, 1984, petitioner Malandro also filed two claim petitions against Campbell. The petitions alleged that Calabro, Bialkowski and Malandro had sustained hearing losses due to occupational exposure to loud noise.
Claim Petition No. 81-36929 sought benefits related to Calabro's hearing loss due to exposure during the period from June 24, 1941 to July 31, 1979. Claim Petition No. 81-36928 sought benefits related to Calabro's hearing loss due to exposure during the period from August 1, 1979 to November 20, 1981. Claim Petition No. 83-23675 sought benefits related to Bialkowski's hearing loss due to exposure during the period from March 20, 1956 to August 1, 1979. Claim Petition No. 83-23674 sought benefits related to Bialkowski's hearing loss due to exposure during the period from August 1, 1979 to September 20, 1983. Claim Petition No. 84-14847 sought benefits related to Malandro's hearing loss due to exposure during the period from July 29, 1940 to August 1, 1979. Claim Petition No. 84-14848 sought benefits related to Malandro's hearing loss due to exposure during the period from August 1, 1979 to January 31, 1983.
*153 During the periods covered in claim Nos. 81-36929, 83-23675 and 84-14847, Campbell was insured by NJM; during the period covered in Nos. 81-36928, 83-23674 and 84-14848, Campbell was insured by Liberty Mutual. Both insurance companies answered the respective claim petitions, denying liability.
Both Calabro and Bialkowski were tried together on various dates before a Workers' Compensation Judge. On January 28, 1989, the judge incorporated his findings and found that both petitioners had suffered bilateral hearing loss due to prolonged occupational exposure to hazardous noise. He made the following awards. On No. 81-36928, the judge found petitioner Calabro had a partial permanent disability in the amount of 27%, and on No. 83-23674 petitioner Bialkowski had a partial permanent disability of 42%. The court awarded to petitioner Calabro $2,538, which represents $47 per week (using 1981 rates) for 54 weeks. The court awarded petitioner Bialkowski $5,292, which represents $63 per week (using 1983 rates) for 84 weeks. The court dismissed claim Nos. 83-23675 and 81-36929.
The Malandro case was tried on various dates before another Workers' Compensation Judge. On June 30, 1989, the judge found petitioner Malandro had a partial permanent disability of 65% for bilateral hearing loss due to prolonged occupational exposure to hazardous noise on No. 84-14848. The court awarded petitioner Malandro $8,938, which represents $68.75 per week (using 1983 rates) for 130 weeks. The court dismissed No. 84-14847.
Liberty Mutual appealed from the decision under Nos. 81-36928 (Calabro); 83-23674 (Bialkowski) and No. 84-14848 (Malandro). Liberty Mutual does not challenge the amount of the awards to petitioners Calabro, Bialkowski and Malandro; rather, it challenges the court's decision which requires Liberty Mutual to pay the full awards.
The essential facts are not in dispute. Petitioner Calabro began working for Campbell on June 24, 1941, and retired on March 31, 1982. During his employment, Calabro worked for *154 only Campbell. He left Campbell for two years to serve in the armed forces during World War II and states that he was exposed to artillery firing during that time, leaving him with a ringing in his ears.
Calabro began working for Campbell as a laborer stationed in Building 26, which was part of Campbell's canning line where soup cans traveled over the laborers' heads. To communicate among themselves, the laborers had to shout to one another. Calabro worked in Building 26 for seven or eight years, and then he was transferred to Building 21. Although canning lines were still present, the noise was less. After another ten or twelve years, Calabro was transferred to the salvage room where more canning lines were present. Eventually, Calabro became a cook and was moved to another area.
Petitioner Bialkowski began working for Campbell on March 20, 1956, and continued to work for Campbell at least until April 23, 1986. Bialkowski also worked in the canning division, where the noise was substantial. Although he served in the National Guard, Bialkowski never served full-time military duty. Also, Bialkowski had a mastoid operation prior to working for Campbell, but testified his hearing was unaffected by the operation.
Petitioner Malandro began working for Campbell on July 28, 1940, and continued to work for Campbell until he retired on January 31, 1983, except for 34 months during which he served in the armed forces in World War II. Malandro worked in the pressroom in the canning division, where the noise was also substantial.
While employed at Campbell, petitioners were required to submit to audiogram testing. Campbell's medical supervisor, Mary T. Budusky, R.N., testified concerning the method of conducting hearing examinations. Prior to March 24, 1983, Campbell used a Maico machine to perform the hearing tests. After that date, it used a more sophisticated Tractor 400 microprocessor, a computerized audiometer which provided a *155 more accurate reading. She also questioned the soundness of the earlier tests because it was not certain that, prior to 1981, the employees were consistently tested prior to commencing work.
Petitioners also underwent audiogram testing performed by August P. Ciell, M.D.

(a) Calabro

The audiogram tests performed on Calabro while NJM insured Campbell indicated the following results:

 March 3, 1971 0% hearing loss
 March 14, 1971 0% hearing loss
 January 6, 1975 15.4% hearing loss

The tests performed on Calabro while Liberty Mutual insured Campbell indicated the following:

 September 20, 1979 45% hearing loss
 May 23, 1981 50% hearing loss

The tests performed on Calabro on September 22, 1981 by Dr. Ciell indicated a 27% hearing loss. The test performed on Calabro on May 11, 1982 by James M. Sumerson, M.D., Dr. Ciell's associate, indicated that there was little change. Based on the evidence, the compensation judge found Calabro was entitled to an award of permanent disability in the amount of 27% for bilateral hearing loss.

(b) Bialkowski

The audiogram tests performed on Bailkowski while NJM insured Campbell indicated the following results:

 April 18, 1973 19% hearing loss
 April 17, 1978 34% hearing loss
 April 19, 1978 40% hearing loss
 April 24, 1978 40% hearing loss

The tests performed while Liberty Mutual insured Campbell indicated the following:

*156
 November 6, 1979 40% hearing loss
 January 26, 1981 40% hearing loss
 January 28, 1982 39% hearing loss
 February 15, 1983 34% hearing loss
 August 28, 1985 25% hearing loss

The tests performed on Bialkowski on May 24, 1983 by Dr. Ciell indicated 40% hearing loss. The test performed on December 19, 1983 by Rowan C. Pearce, M.D., indicated 32.5% hearing loss. Based on the evidence, the compensation judge found Bialkowski was entitled to an award of partial permanent disability in the amount of 42% for bilateral hearing loss.

(c) Malandro

The audiogram tests performed on Malandro while NJM insured Campbell indicated the following results:

 April 28, 1969 40.74% hearing loss
 July 25, 1971 51.58% hearing loss
 November 21, 1973 47.80% hearing loss
 March 18, 1975 73.16% hearing loss
 March 26, 1976 73.16% hearing loss
 October 5, 1976 77.33% hearing loss
 March 30, 1977 75.66% hearing loss
 March 2, 1978 72.90% hearing loss
 February 18, 1979 75.83% hearing loss

The tests performed while Liberty Mutual insured Campbell indicated the following:

 April 16, 1981 77.81% hearing loss
 May 5, 1982 76.5% hearing loss

The tests performed on October 3, 1984 by Dr. Ciell indicated 68.6% hearing loss. The test performed on October 8, 1984 by Dr. Pearce indicated 63.33% hearing loss. Based on the evidence, the compensation judge found Malandro was entitled to an award of partial permanent disability in the amount of 65% for bilateral hearing loss.
There was some testimony concerning petitioners' use of ear protection. According to Budusky, all Campbell employees were fitted for ear plugs by 1981. She stated that prior to *157 1981, ear protection available to the employees was questionable because the ear plugs were dispensed without supervision. In 1981, Budusky removed the ear plugs from the storeroom, took them to the medical facility and fitted all Campbell employees for ear plugs. Although there was testimony from petitioners that they wore ear protection, the compensation judge found that the ear plugs were not used regularly.
On the issue of apportioning the awards between NJM and Liberty Mutual, the compensation judge in Calabro and Bialkowski determined that Liberty Mutual was responsible for all of Calabro's and Bialkowski's benefits. He noted that if the award were apportioned, petitioners would receive a reduced amount which would not further the purpose of the 1979 amendments to the Workers' Compensation Act, i.e., to put more money into the hands of seriously injured workers. The judge also determined that the hearing loss provisions of the Workers' Compensation Act eliminated apportionment in hearing loss cases.
The compensation judge in Malandro also determined that Liberty Mutual was fully responsible for Malandro's benefits. The judge determined that the hearing loss provisions of the Workers' Compensation Act eliminated apportionment in hearing loss cases. He noted that the earlier testing by Campbell was inaccurate and impractical to use for the purposes of apportionment.
On appeal Liberty Mutual contends that liability for an occupational hearing loss caused by exposure to loud noise over a period of years can be apportioned between compensation insurance carriers pursuant to Scheier v. Garden State Forge Company, 136 N.J. Super. 555, 347 A.2d 362 (App.Div. 1975) if, prior to the change in coverage, the disability was disclosed by competent medical examination, working capacity, or manifest loss of physical function.
NJM contends the compensation court's determination that the provisions of the Occupational Hearing Loss Statute, N.J. *158 S.A. 34:15-35.10, et seq., overrule apportionment in occupational hearing loss cases is correct. It also contends that there is insufficient credible evidence in the record to support apportionment because Campbell's pre-1980 audiograms did not adhere to the specific criteria of the New Jersey Occupational Hearing Loss Statute.
Bialkowski asserts that the issues raised by Liberty Mutual are moot for failure to appeal the dismissal of Claim Petition No. 83-23675 for his hearing loss prior to August 1, 1979.

I
The seminal case in New Jersey on apportionment is Bond v. Rose Ribbon & Carbon Co., 42 N.J. 308, 200 A.2d 322 (1964), aff'g 78 N.J. Super. 505, 189 A.2d 459 (App.Div. 1963). In Bond, industrial dust and fumes aggravated the petitioner's latent tuberculosis. The seriousness of the condition was not discovered until a second carrier had been on the risk for only one month. This court held that the carrier whose policy was in force when the risk was discovered was liable for the full award. Id. 42 N.J. at 311, 200 A.2d 322.
The Supreme Court held that where an employee is exposed to work conditions which activate or cause a progressive occupational disease, and the existence of such disease remains undisclosed and unknown over a period of time, it is impossible upon ultimate revelation of its existence by medical examination, work incapacity, or manifest loss of physical function, to pinpoint in retrospect the triggering date of such activation or inception. Ibid. Therefore, any apportionment of compensation liability between the successive employments or insurance coverages is speculative and arbitrary. Ibid.
To avoid the morass into which litigation would be pitched were apportionment required, and to eliminate the recognized unsatisfactory nature of any such attempted ascertainment, we conceive that the most workable rule and that most consistent with the philosophy and public policy of the Workmen's Compensation Act is to hold liable that employer or carrier during whose employment or coverage the disease was disclosed as above noted, i.e., by *159 medical examination, work incapacity, or manifest loss of physical function. Although this test is admittedly arbitrary and may on occasion cause some apparently unfair results, over the years it should result in an equitable balancing of liability. Under the circumstances we conceive it to be the fairest and most workable thesis. [Ibid.]
In Giagnacovo v. Beggs Bros., 64 N.J. 32, 311 A.2d 745 (1973), a bricklayer suffered from an arthritic wrist which became worse over the course of five successive employments. He had a 50% disability of the hand and the disability was apportioned 45% to the last employer and 5% to the first employer with none to intervening employers. Id. at 35, 311 A.2d 745. The Supreme Court affirmed, holding that an apportionment conferring the entire responsibility upon the first employer would be a mistake because the condition was not sufficiently fixed, arrested and definitely measurable to support such a ruling. The Court also found that there was sufficient credible evidence to support the apportionment that was made below because evidence of deterioration during the last employment had been adduced. Id. at 38-39, 311 A.2d 745.
In clarifying the holding in Bond, the Giagnacovo Court noted that:
The per curiam opinion of this court in Bond constituted (1) a succinct summary of the reasons for not employing the apportionment approach in allocating liability in this kind of occupational disease case; and (2) an affirmance, "generally for the reasons stated" in the Appellate Division opinion (78 N.J. Super. 505 [189 A.2d 459]), of the judgment of that court in finding that a later insurer of the employer had not demonstrated that petitioner's occupational tuberculosis had reached a compensable stage during the coverage of a prior insurer. The criteria of employer liability in this kind of case were stated in the Bond per curiam as follows (42 N.J. at 311 [200 A.2d 322]):
"* * * to hold liable that employer or carrier during whose employment or coverage the disease was disclosed as above noted, i.e., by medical examination, work incapacity, or manifest loss of physical function." (Emphasis added)
However, this thumb-nail formulation is better understood and applied by reference to the discussion of the development of the stated criteria in the Appellate Division decisions in the Bond case itself (78 N.J. Super. 514-518 [189 A.2d 459]), and in Bucuk v. Edward A. Zusi Brass Foundry, 49 N.J. Super. 187, 202-207 [139 A.2d 436] (App.Div. 1958), certif. den. 27 N.J. 398 [143 A.2d 9] (1958) and Brooks v. Bethlehem Steel Co., 66 N.J. Super. 135, 144-146 [168 A.2d 670] (App.Div. 1961), certif. den. 36 N.J. 29 [174 A.2d 657] (1961). An examination *160 of these cases will show that two of the Bond criteria, i.e., (a) disclosure by medical examination, and (b) disclosure by manifest loss of physical function, represent in substance two methods of revelation of a specific degree of physiological pathology  one which is fixed, arrested and definitely measurable. See Brooks, supra, 66 N.J. Super. at 146 [168 A.2d 6]; Bond, supra (78 N.J. Super. at 516, 518 [189 A.2d 459]); cf. Ort v. Taylor-Wharton Co., supra, 47 N.J. [198] at 204 [219 A.2d 866]. Medical examination and diagnosis are ordinarily required for its ascertainment when the condition is internal, as in Brooks, but ordinarily not when it is external, such as perforated septum, Calabria v. Liberty Mutual Insurance Company, 4 N.J. 64 [71 A.2d 550] (1950), or a "Dupuytrens Contracture", Duncan v. T.I. McCormack Trucking Co., 43 N.J. Super. 352 [128 A.2d 722] (App.Div. 1956), such being conditions "cognizable even by a layman", Bucuk v. Edward A. Zusi Brass Foundry, supra, 49 N.J. Super. at 206 [139 A.2d 436] [64 N.J. at 37-38, 311 A.2d 745 (footnotes omitted).]
Accord Cusatis v. American Cyanamid, 176 N.J. Super. 329, 336, 423 A.2d 316 (1980).
As to a hearing loss, in Scheier v. Garden State Forge Co., 136 N.J. Super. 555, 347 A.2d 362 (App.Div. 1975) the petitioner was awarded compensation for 75% binaural hearing loss caused by exposure to loud noises in his employer's forging and foundry industry. The employer's insurer contended that the previous carrier, should be required to pay 85% of the award because, while the latter insured the employer, the claimant had undergone a hearing examination that established a hearing loss of 55.5% in one ear and 108% (sic) in the other. This court agreed, holding that the carrier liable is the carrier during whose coverage an occupational disease is discovered by medical examination, even though no claim is made until coverage had ceased. Id. at 559-560, 347 A.2d 362. The matter was remanded for proper apportionment of liability between the two insurers.
From the foregoing decisions, we conclude that prior to the amended Workers' Compensation Act of 1979 and Occupational Hearing Loss Statute of 1979, if there was no rational basis upon which a court could make an apportionment of a compensable injury between successive employers or insurance carriers, then full liability was imposed on the last employer or insurance carrier. Bond, 42 N.J. at 311, 200 A.2d 322. On the *161 other hand, if there was a rational basis upon which to apportion liability  e.g. where prior injury is disclosed either by manifest loss of physical function which presents a specific degree of pathology, measurably fixed, arrested and definite  then an apportionment between employers and insurance carriers may be made. Giagnacovo, 64 N.J. at 37-38, 311 A.2d 745; Scheier, 136 N.J. Super. at 559, 347 A.2d 362.

II
In Calabro and Bialkowski, the compensation judge rejected Liberty Mutual's argument, holding that the 1979 amendments to the Workers' Compensation Act overrule Scheier, preventing hearing loss cases from being apportioned. The judge noted that prior to 1980, occupational hearing loss cases were governed by the Workers' Compensation Act generally and by case law. In 1980, the Workers' Compensation Act was significantly amended by L. 1979, c. 283, § 1 et seq., effective January 10, 1980. The legislative purpose of these amendments was to put significantly more money into the hands of seriously injured workers, while providing reform and meaningful cost containment for New Jersey employers from unjustified compensation claims. Joint Statement of Senate Labor, Industry and Professions Committee and Assembly Labor Committee to S. 802 and A. 840 (1979). To this end, the Legislature amended N.J.S.A. 34:15-12, raising the amount of weekly compensation in the Disability Wage and Compensation Schedule. L. 1979, c. 283, § 5, effective January 10, 1980.
Also effective in 1980, was the Occupational Hearing Loss Act, L. 1979, c. 285, § 1 et seq., N.J.S.A. 34:15-35.10 et seq. The Act applies to all actions instituted 60 days after January 10, 1980, L. 1979, c. 285, § 15, reprinted in Historical Note to N.J.S.A. 34:15-35.10, and provides that all provisions of the Workers' Compensation Act apply to hearing loss cases unless they are inconsistent with the specific provisions of the Hearing *162 Loss Act. N.J.S.A. 34:15-35.10 et seq.[1] NJM argues that "[r]ead broadly, N.J.S.A. 34:15-35.10 supplies the statutory authority for finding that pre-existing case law inconsistent with the hearing loss statutes no longer applies in hearing loss cases."
The Compensation Judge in Calabro and Bialkowski noted that, rather than the full award being calculated at the higher post-amendment values in N.J.S.A. 34:15-12, NJM's award would be calculated at the pre-amendment values. He determined that the Legislative purpose made it clear that the statute overruled the apportionment established in case law.
NJM's argument is essentially the same position as the compensation judge's. It contends that the language in § 11 preempts Scheier. Section 11 provides:
No claims for compensation for occupational hearing loss shall be filed until after 4 full consecutive calendar weeks have elapsed since removal from exposure to hazardous noise in employment. Removal from exposure to hazardous noise in employment may be achieved by use of effective ear protection devices. The last day of such exposure shall be the date of the disability. [N.J.S.A. 34:15-35.20 (emphasis supplied).]
NJM argues that "since [the last sentence of N.J.S.A. 34:15-35.20] addresses the exact same issue addressed in Scheier [it] has the effect of pre-empting or overruling Scheier on this issue in the context of occupational hearing loss cases." While the statute changed the date of disability from the date of manifestation to the last date of exposure, it does not discuss or deal with the issue of apportionment.
NJM's interpretation of the last sentence of N.J.S.A. 34:15-35.20 is a strained construction. Generally, statutory *163 language should be given its ordinary meaning absent specific intent to the contrary. Renz v. Penn Cent. Corp., 87 N.J. 437, 440, 435 A.2d 540 (1981). It should be construed as written, no broader than the language justifies, Lynch v. Borough of Edgewater, 8 N.J. 279, 285, 85 A.2d 191 (1951), and not according to some unexpressed intention. Dacunzo v. Edgye, 19 N.J. 443, 451, 117 A.2d 508 (1955); Hoffman v. Hock, 8 N.J. 397, 409, 86 A.2d 121 (1952). The court is not at liberty to indulge in presumptions that the legislature intended something more than what it actually wrote in the law. Graham v. City of Asbury Park, 64 N.J. Super. 385, 165 A.2d 864 (Law Div. 1960), rev'd on other grounds, 69 N.J. Super. 256, 174 A.2d 244 (App. Div. 1961), aff'd, 37 N.J. 166, 179 A.2d 520 (1961). Where the statute's meaning is plain, the court's sole function is to enforce it according to its terms, Sheeran v. Nationwide Mut. Ins. Co., Inc., 80 N.J. 548, 556, 404 A.2d 625 (1979), quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442, 452 (1917), and there is no room for judicial construction or interpretation. Watt v. Mayor and Council of Borough of Franklin, 21 N.J. 274, 277, 121 A.2d 499 (1956).
As noted, N.J.S.A. 34:15-35.20 does not address the concept of apportionment. The fact that the last date of exposure to hazardous noise in employment establishes the date of disability does not negate the existence of a disability prior to the last date of exposure; it merely establishes the time frame for fixing the date to determine the hearing loss and therefore the amount of any award. This concept is fortified by N.J.S.A. 34:15-35.13a. which provides that:
Where hearing loss measurement is practicable, an employer shall be liable for the hearing loss of an employee to which his employment has contributed. If previous occupational hearing loss or hearing loss from non-occupational causes is established by competent evidence, including the results of a placement audiogram, the employer shall not be liable for the hearing loss so established whether or not compensation has previously been paid or awarded, and shall be liable only for the difference between the percentage of disability determined as of the date of disability, as herein defined and the *164 percentage of disability established by the placement audiogram.[2] [Emphasis supplied.]
The above statute is consistent with N.J.S.A. 34:15-12d. under the Workers' Compensation Act which provides:
If previous loss of function to the body, head, a member or an organ is established by competent evidence, and subsequently an injury or occupational disease arising out of and in the course of employment occurs to that part of the body, head, member or organ, where there was a previous loss of function, then and in such case, the employer or the employer's insurance carrier at the time of the subsequent injury or occupational disease shall not be liable for any such loss and credit shall be given the employer or the employer's insurance carrier for the previous loss of function and the burden of proof in such matters shall rest on the employer. [Emphasis supplied.][3]
NJM's construction of N.J.S.A. 34:15-35.20 requires us to ignore the specific provisions in both the amended hearing loss statute and workers' compensation statute which authorize apportionment if established by "competent evidence." A cardinal rule of statutory construction is that full effect is given, if possible, to every word of the statute. It cannot be assumed that the Legislature used meaningless language. Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 A.2d 6 (1969), citing Hoffman, 8 N.J. at 406-407, 86 A.2d 121.
Further, under Bond as explained and amplified in Giagnacovo and applied in Scheier, if it is possible to determine in retrospect prior data of a disability "by medical examination, working capacity, or manifest loss of physical function," Bond, 42 N.J. at 311, 200 A.2d 322, then apportionment between employers and insurance carriers may be applied. The intention to change a long-established rule or principle is not imputed to the Legislature absent a clear manifestation. Elberon *165 Bathing Co., Inc. v. Ambassador Ins. Co., Inc., 77 N.J. 1, 18, 389 A.2d 439 (1978); see also De Fazio v. Haven Savings and Loan Ass'n., 22 N.J. 511, 519, 126 A.2d 639 (1956); Lisi v. Parnell, 201 N.J. Super. 321, 327, 493 A.2d 40 (App.Div. 1985). Here there is no clear manifestation to change pre-existing case holdings, but, to the contrary, N.J.S.A. 34:15-35.13a. and 34:15-12(d) preserves the doctrine of apportionment.
For the foregoing reasons, the portions of the judgments of the Division of Workers' Compensation entered on January 30, 1989 and June 30, 1989, establishing permanent disability for bilateral hearing losses of the petitioners are affirmed; the portions of the judgments assessing the entire awards against Liberty Mutual without apportionment with NJM is vacated and the matters are remanded for further proceedings as set forth below.

III
NJM contends that if the award is apportioned, the higher rates of the 1979 amendments would not apply to its portion of the award. NJM supports its position by reviewing provisions of the Workers' Compensation Act in conjunction with provisions of the Hearing Loss Act. N.J.S.A. 34:15-35.18 directs that compensation for hearing loss be paid according to the rates established in N.J.S.A. 34:15-12c which were increased by the 1979 amendments. L. 1979, c. 283, § 5. Section 19 of L. 1979, c. 283 provides that the 1979 amendments apply only to "accidents and occupational disease exposures which occur on or after January 1, 1980 and shall not be applied retroactively to accidents or occupational diseases occurring prior to January 1, 1980 except to cases where claim is made for an occupational disease characterized by latent manifestation as set forth in R.S. 34:15-34." L. 1979, c. 283, § 19 (quoted in N.J.S.A. 34:15-7, Historical Note).
NJM contends that the issue of an application of the appropriate rate schedule was dealt with in Rybski v. Johns-Manville *166 Products Corp., 185 N.J. Super. 433, 449 A.2d 540 (App.Div. 1982) and Falcon v. American Cyanamid, 221 N.J. Super. 252, 534 A.2d 403 (App.Div. 1987). However, neither Falcon nor Rybski are relevant to apportionment. In Rybski, the court found that L. 1979, c. 283, § 19 barred retroactive application of the 1980 rates where the disease manifested itself before 1980 and the petition was filed before 1980. 185 N.J. Super. 436, 437, 449 A.2d 540; see Falcon, 221 N.J. Super. at 261, 534 A.2d 403. In Falcon, the disease manifested itself after the new rates became effective and the petition also was filed after the effective date of the new rates. Consequently, the new rates were held applicable. 221 N.J. Super. 260, 264, 534 A.2d 403.
At any rate, Falcon, Rybski, Bond, Giagnacovo and Scheier were all determined under the date of "manifestation" rule which was specifically rejected under the Occupational Hearing Loss Act, N.J.S.A. 34:15-35.20, which adopted the last day of exposure rule as the date of the disability. Here, both the last date of exposure and the filing of the petitions occurred after the effective date of the Occupational Hearing Loss Act, L. 1979, c. 285, § 1 et seq., effective January 10, 1980. Therefore, the higher rates under the 1979 amendments apply to the amounts awarded to the petitioners. However, we agree with NJM that in the event of any apportionment, Liberty Mutual would be liable for the full award under the post-1979 rates but NJM would be liable for reimbursement at the pre-1979 rates.

IV
Lastly, NJM contends that, in any event, there is insufficient credible evidence in the record to support apportionment because Campbell's pre-1980 audiograms do not meet the specific criteria of the New Jersey Occupational Hearing Loss Statute. This contention is without merit.
NJM maintains that the testimony at trial "was such as to cast significant doubt upon the accuracy of the audiogram results obtained by Campbell prior to 1981." It maintains that *167 the "anomalous" audiogram results make it impossible to utilize the Campbell tests to apportion the disability. Indeed the Workers' Compensation Judge in Malandro held that it was impracticable to use those tests for the purposes of N.J.S.A. 34:15-35.13.
The Occupational Hearing Loss Act requires that all hearing tests be conducted on air-conduction audiometric instruments which are calibrated in accordance with the American National Standard (ANSI S3.6-1969-R 1973 and ANSI S3.13-1972). The tests must be performed in an environment as prescribed by the American National Standard, ANS S3.1-1960 R 1971 (American Standard Criteria for Background Noise in Audiometer Rooms). The tests cannot be conducted unless the claimant has been removed from exposure to hazardous noise for at least 16 hours. Calibration of the audiometric instruments used must be performed annually and must be maintained within the tolerances permitted by the ANSI standards. N.J.S.A. 34:15-35.16; see New Jersey Practice (Gelman), Workers' Compensation Law, § 239 at 103 (1988).
The statute further provides that all hearing tests conducted under the statutory requirements must be performed by a person who is certified as an audiometric technician or a higher level, and one who meets the standards of the Intersociety Committee on Audiometric Technician Training and the New Jersey State Department of Health. Furthermore, if a hearing loss is actually demonstrated, then the employee must be referred for an audiological evaluation by an audiologist holding a certificate of clinical competence issued by the American Speech and Hearing Association or an equivalent society, or referred to a physician certified by the American Board of Otolaryngology. N.J.S.A. 34:15-35.17; Gelman, § 239 at 103.
NJM's contention is rejected for three reasons. First, in Rybski, the Compensation Judge found that although there was no objective medical evidence, a petitioner's lung function had been impaired by structural changes based upon his subjective *168 testimony, without objective medical evidence. 185 N.J. Super. at 435, 449 A.2d 540. The award, as of August 21, 1979, was based upon petitioner's oral testimony concerning his disability which resulted from asbestosis. The issue raised implicated the comprehensive revision of the Workers' Compensation Act and particularly N.J.S.A. 34:15-36, defining disability in terms of an impairment "based upon demonstrable objective medical evidence." In affirming the Compensation Judge, this court held that the subjective evidence of impairment was a sufficient basis for disability and that N.J.S.A. 34:15-36 was not retrospectively applicable to the petition which was filed prior to the effective date of the amendment and based upon manifestations of occupational disease appearing prior to that effective date. Id. By the same token the rigid requirements of N.J.S.A. 34:15-35.16 and 35.17 could not possibly be applicable retroactively prior to the effective date of the adoption of the Occupational Loss of Hearing Act.
Second, prior to 1979, the formula used to calculate hearing losses was a calculation of the average sum of the loss found in both ears and then a transposition of the percentages upon the schedule of percentage loss in effect at the time of the examination. Katona v. Federal Ship Building & Dry Dock Co., 136 N.J.L. 474, 56 A.2d 609 (Sup.Ct. 1948). As to the quality of evidence to approve the hearing loss, Judge (later Justice) Heher, speaking for the court, held:
In the final analysis, the inquiry is whether, after an examination and comparison of all the evidence, the minds of the triers of facts are convinced of the existence of the claimed injury and the requisite causal relationship. And the conviction need not have the quality of certainty. It suffices if there be a belief grounded in reasonable probability of truth according to common experience of mankind  such as guide men of prudence and discretion in ordinary affairs of life.
Here, the quality of the tests prior to January 10, 1980, certainly did not rise to the standards as required by the Occupational Hearing Loss Act. Nevertheless, such proofs may be competent upon which to make a determination of hearing loss under *169 Katona in view of the less stringent requirements of proof of hearing loss prior to the 1979 amendments.
Third, neither the Occupational Hearing Loss Statute, N.J.S.A. 34:15-35.13a. nor the 1979 amendments to the Workers' Compensation Act, N.J.S.A. 34:15-12(d.), require the strict standards as set forth in N.J.S.A. 34:15-35.16 and 35.17 for a hearing loss sustained prior to the effective date of the Hearing Loss Act. In order to determine apportionment, both acts merely require that a hearing loss or loss of a function may be "established by competent evidence." (Emphasis supplied.) "Competent" has been defined as: "3: Legally qualified or adequate." Webster's Ninth New Collegiate Dictionary at 268 (1983).
Thus, if the Workers' Compensation Judges, on remand, determine that the quality of the evidence in accordance with Katona standards is competent to determine a degree or percentage of hearing loss, then that evidence may be considered by the judge for an apportionment on remand.

V
Bialkowski contends that the issues raised by Liberty Mutual are moot for failure to appeal the dismissal of Claim Petition No. 83-23675. We reject as totally without merit petitioner's contention. Only a party aggrieved by a judgment may appeal therefrom. Howard Savings Inst. v. Peep, 34 N.J. 494, 499, 170 A.2d 39 (1961). Here, the dismissal of petitioner's claim was in favor of Liberty Mutual which, therefore, is not an aggrieved party. Moreover, the relief sought in Claim Petition No. 83-23675 was granted in the award under Claim Petition No. 83-23674.
The judgments of January 30, 1989 and June 30, 1989 establishing permanent disability for bilateral hearing losses of petitioners is affirmed but the judgments are reversed in assessing the entire awards against Liberty Mutual without apportionment with NJM; the matters are remanded for a determination *170 as to whether the evidence under the pre-1980 standard is sufficient to determine a degree of hearing loss, if any, to be considered for apportionment and, if so, to make appropriate apportionments of the awards between Liberty Mutual and NJM.
NOTES
[*] These appeals having been argued together are consolidated for the purpose of this opinion.
[1] N.J.S.A. 34:15-35.10 concerning occupational hearing loss provides:

Compensation for noise induced occupational loss of hearing which constitutes an occupational disease shall be paid only as provided in this act. All provisions of chapter 15 of Title 34 of the Revised Statutes applicable to claims for injury by accident, shall apply to compensable occupational hearing loss, except to the extent that they are inconsistent with the provisions of this act.
[2] Although the statute mentions only the employer, in workers' compensation cases, the insurance carrier is identified with and ordinarily means the employer. The employee's claim petition form requires that the insurance company also be named if there is insurance coverage.
[3] Under L. 1979, c. 283, § 5, subsection d. was amended by substituting "the employer's" before "insurance carrier" throughout the section. See Historical Note, N.J.S.A. 34:15-12 (West's Annotation at 204 (1988)).